1         UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,            )
                                         )
6                     PLAINTIFF,         ) CASE NO.
                                         ) CR 13-902 PSG
7           VS.                          )
                                         )
8   PAUL ANTHONY CIANCIA,                )
                                         )
9                     DEFENDANT.         )
    _____)

10

11

12

13

14                REPORTER'S TRANSCRIPT OF
                     MOTION TO SUPPRESS
15              TUESDAY, OCTOBER 13, 2015
                         1:37 P.M.
16              LOS ANGELES, CALIFORNIA

17

18

19

20

21

22     _____

23          MAREA WOOLRICH, CSR 12698, CRR
            FEDERAL OFFICIAL COURT REPORTER
24         255 EAST TEMPLE STREET, ROOM 181-K
            LOS ANGELES, CALIFORNIA 90012
25              mareawoolrich@aol.com


                UNITED STATES DISTRICT COURT

1                 **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4      STEPHANIE YONEKURA
         UNITED STATES ATTORNEY

5      BY:  JOANNA CURTIS
         PATRICK FITZGERALD

6      MICHAEL WARBEL
         Assistant United States Attorneys

7      United States Courthouse
         312 North Spring Street

8      Los Angeles, California 90012

9

10  **FOR THE DEFENDANT:**

11     HILARY LEE POTASHNER
        FEDERAL PUBLIC DEFENDER

12     BY:  JOHN LITTRELL
        EMILY GROENDYKE

13     GARY ROWE
        RICHARD NOVAK

14     HILARY POTASHNER
        Deputy Federal Public Defenders

15     Central District of California
        321 East Second Street

16     Los Angeles, California 90012

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1                          I N D E X

 2

 3                  TUESDAY, OCTOBER 13, 2015

 4

 5                        WITNESSES

 6
     Government's                                       Voir
 7   Witnesses:          Direct  Cross  Redirect  Recross  Dire

 8   Daniel Yu             6       9       31

 9   Jeffrey Swegles      32      33       44       44

10

11

12   Defendant's:                                     Voir
     Witnesses:          Direct  Cross  Redirect  Recross  Dire
13
     Steve Zouzounis      47      62       63
14

15

16

17                        EXHIBITS

18
                          For          In     Withdrawn
19   Exhibit No.      Identification  Evidence  or Rejected

20   1                                  46

21   2                                  46

22   3                                  46

23   101                                15

24   102                                15

25
```

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, OCTOBER 13, 2015

 2                               1:37 P.M.

 3                               -oOo-

 4

 5

 6              THE CLERK:  Calling Criminal 13-902, United States

 7   of America versus Paul Anthony Ciancia.

 8         Counsel, please state your appearances.

 9              MS. CURTIS:  Good afternoon, Your Honor.

10   Joanna Curtis, Patrick Fitzgerald, and Mike Warbel on behalf of

11   the United States.  Present with us at counsel table is FBI

12   Special Agent Steve Khoobyarian, who is the case agent.

13              MR. LITTRELL:  Good afternoon, Your Honor.

14   John Littrell for Mr. Ciancia.  He is here.  He's cuffed.  I

15   would ask that he be uncuffed before we get started.

16              THE COURT:  Well, let's just take care of the

17   appearances.  I'll do that right after you state the

18   appearances.

19              MR. LITTRELL:  With me at counsel table is

20   Emily Groendyke, our paralegal, Gary Rowe, Rich Novak, and

21   Hilary Potashner.

22              THE COURT:  Thank you.  Mr. Ciancia may be

23   unshackled.

24              MR. LITTRELL:  Thank you, Your Honor.

25              THE COURT:  Any preliminary matters before we start
```

1  with the motion to suppress?

2       MS. POTASHNER:  Yes, Your Honor.  Hilary Potashner.

3  May I make my appearance from here?

4       THE COURT:  Yes.

5       MS POTASHNER:  Thank you very much.

6       Your Honor, as the Court may well remember, this motion

7  was sealed.  It was filed under seal by stipulation with the

8  government, I believe, but I'm sure they'll correct me if I'm

9  wrong.

10      And based on it being sealed and based on the nature and

11 the basis for the sealing, we would ask that the courtroom be

12 closed for that aspect of today's hearing.  Obviously the other

13 motion was filed in open court, and that should follow through

14 in today's court hearing.

15      THE COURT:  That motion to seal the courtroom is

16 denied.

17      All right.  Let's go ahead and proceed with the first

18 witness.

19      MS. CURTIS:  Thank you, Your Honor.  The government

20 calls Officer Daniel Yu.

21      THE CLERK:  Sir, if you can please stand next to the

22 court reporter's desk and raise your right hand.

23      Do you solemnly swear that the testimony you shall give in

24 the cause now before this Court shall be the truth, the whole

25 truth, and nothing but the truth, so help you God?

1          THE WITNESS:  Yes.

2          THE CLERK:  Thank you.  Please take a seat.

3          THE COURT:  I've read the declaration.

4    Cross-examination.

5          MR. LITTRELL:  Your Honor, before we get started, I

6    just would ask the Court -- that the Court confer with the

7    government about this -- that the Court admonish each witness

8    not to talk about their testimony when they leave the

9    courtroom, because we have a number of other witnesses waiting.

10         THE COURT:  The witnesses are ordered not to discuss

11   their testimony when they leave the courtroom.  Thank you.

12         MS. CURTIS:  Your Honor, I'm going to tender the

13   declaration, and I have only one additional question if that's

14   okay with the Court.

15         THE COURT:  You may.

16                         DANIEL YU,

17   called as a witness by the Government, was sworn and testified

18   as follows:

19                      DIRECT EXAMINATION

20   BY MS. CURTIS:

21   Q    Good afternoon, Officer Yu.

22   A    Good afternoon.

23   Q    Could you please open the manila folder in front of you

24   and turn to Government's Exhibit 1.

25   A    Okay.

**UNITED STATES DISTRICT COURT**

1    Q     Do you recognize this document?

2    A     Yes.

3    Q     What is it?

4    A     It's the declaration.

5    Q     Is it your declaration?

6    A     Correct.

7    Q     Was it prepared in connection with this hearing today?

8    A     Correct.

9    Q     Is everything in it true and correct?

10   A     Correct.

11          THE COURT:  I'm sorry.  Do I have -- I have a book

12   of exhibits, but it starts with 101.

13          All right.  I have it now.

14          MS. CURTIS:  Thank you.

15   Q    Officer Yu, I only have one additional question in

16   addition to the questions you already answered in the

17   declaration, and that is could you estimate how long it is you

18   questioned the defendant on November 1st, 2013?

19   A    Several minutes, about three or four minutes.

20          MS. CURTIS:  Okay.  Thank you.  I have nothing

21   further.

22          THE COURT:  Mr. Littrell, I don't want to jump on

23   your cross.  I have a couple of questions.  I thought it would

24   be better if I asked him first so that you could -- if there's

25   anything you want to address, you could address it.

```
 1              MR. LITTRELL:  Makes sense, Your Honor.
 2              THE COURT:  All right.  Again, some of these matters
 3   may be peripheral, but about what time did you question
 4   Mr. Ciancia?
 5              THE WITNESS:  Are you asking for a specific time?
 6              THE COURT:  The best you can, best estimate.
 7              THE WITNESS:  Sometime around 9:00.
 8              THE COURT:  A.M.?
 9              THE WITNESS:  Yes.
10              THE COURT:  When you questioned the -- when you
11   questioned Mr. Ciancia, before you started your questioning,
12   how many people in the general area did you observe?
13              THE WITNESS:  Are you talking passengers or
14   police officers as well or just --
15              THE COURT:  Let's start with everybody.  And then if
16   you can break that number down into passengers versus
17   police officers just in the general vicinity of the shooting.
18              THE WITNESS:  I guess within the general vicinity,
19   about maybe a dozen people.
20              THE COURT:  And of those dozen people, how many were
21   officers?  How many were civilian witnesses?
22              THE WITNESS:  Maybe two or three were civilian
23   witnesses.  They were about 30, 40 feet from where we were.
24   And the rest of us were police officers.
25              THE COURT:  Did Mr. Ciancia show any sign -- you
```

```
 1    indicated in your declaration, I believe, that Mr. Ciancia
 2    was -- appeared conscious, appeared alert and lucid, did not
 3    appear to be disoriented or confused.  Did he appear to have
 4    any signs of distress at that time?
 5              THE WITNESS:  When you say "distress," he was laying
 6    there.  His eyes were pretty wide open.  He appeared to be in
 7    pain due to his injuries.  But other than that, he was lucid
 8    and calm considering what he had been through.
 9              THE COURT:  Considering what he had been through,
10    meaning he had been shot in the face?
11              THE WITNESS:  Correct.
12              THE COURT:  All right.  You may.
13              MR. LITTRELL:  Thank you, Your Honor.
14                         CROSS-EXAMINATION
15    BY MR. LITTRELL:
16    Q    Good afternoon, Officer Yu.
17    A    Good afternoon.
18    Q    So I want you to try to put yourself sort of back where
19    you were on November 1st when you arrived at the airport, okay,
20    and just visualize where you were when you first saw
21    Mr. Ciancia.
22    A    Okay.
23    Q    Where were you?
24    A    Where I was was I was behind one of the counters at the
25    gate area.  I had just come around the corner, and I was
```

**UNITED STATES DISTRICT COURT**

1  attempting to locate Mr. Ciancia.  And I saw, I believe, his

2  leg on the ground.  I just kind of poked my head around the

3  corner and got a better look at him, and he was laid out on the

4  ground.

5  Q    Now, you were planning to come -- you had your weapon

6  drawn at that point?

7  A    Of course.

8  Q    And you were planning to take aim at him and shoot if you

9  could get a look; right?

10  A    If he was still a threat, yes.

11  Q    And you assumed he still was a threat; is that right?

12  A    Yes.

13  Q    But when you saw his leg, it was parallel to the ground;

14  right?

15  A    Correct.

16  Q    Meaning that he was down?

17  A    He could still be a threat at that point.  He could be in

18  the prone position.

19  Q    And prior to that point, you saw officers engaging the

20  suspect?

21  A    Correct.

22  Q    And by "engaging," you meant firing at him?

23  A    Correct.

24  Q    And those officers were Officer Lopez?

25  A    I wasn't sure, but from what I've been told, yes.

**UNITED STATES DISTRICT COURT**

1    Q      And Officer Zouzounis; right?

2    A      Sergeant.

3    Q      Sergeant Zouzounis.

4           And you were the person that said "subject down"; right?

5    A      Right.

6    Q      Because you were the first person that actually saw him on

7    the ground?

8    A      Correct.

9    Q      And you immediately went to him?

10   A      No.

11   Q      Someone immediately went to him?

12   A      Well, we made our approach.  But as we were approaching, I

13   held long so I could have a firearm on him in case he were to

14   reach for the firearm again or he were to make any further

15   movements towards any of the weapons.

16   Q      But ultimately you did approach him?

17   A      Correct.

18   Q      You weren't the first person there?

19   A      Correct.

20   Q      But you were shortly after the first person there?

21   A      What do you mean "first person there"?  As in physically

22   there right next to him or the first person to get to his

23   person?

24   Q      Physically right next to him.

25   A      Yeah, I was one of the first ones there, yeah.

```
1   Q     And what you saw was he was down on the ground?

2   A     Correct.

3   Q     On his stomach?

4   A     Uh-huh.

5   Q     He was facing --

6               THE COURT:  Is that yes?

7               THE WITNESS:  Yes.

8   BY MR. LITTRELL:

9   Q     He was facing you?

10  A     Correct.

11  Q     He was bleeding from his mouth?

12  A     Correct.

13  Q     And he had -- in addition to blood, he also had body

14  tissue, some flesh or tissue, coming from his mouth?

15  A     Correct.

16  Q     And there was a large pool of blood right next to him?

17  A     At that point, no.  It was a small pool.

18  Q     Small pool of blood.  And that pool later became a large

19  pool?

20  A     It became a larger pool, yes.

21  Q     Two officers cuffed him; right?

22  A     Correct.

23  Q     One of the officers was on his back; right?

24  A     What is your question again?

25  Q     Two officers handcuffed him; right?
```

```
 1   A     Correct.

 2   Q     And the first officer who handcuffed him got on his back

 3   with his knee; is that right?

 4   A     Got on his back?  Oh, okay.  I see what you are asking.

 5   It's quite possible, yes.

 6   Q     And the officer put the handcuffs on him; right?

 7   A     Correct.

 8   Q     And so at that point he was handcuffed behind his back?

 9   A     Correct.

10   Q     Bleeding from his mouth?

11   A     Uh-huh.

12   Q     And being held --

13              THE COURT:  Is that yes?

14              THE WITNESS:  Yes.

15   BY MR. LITTRELL:

16   Q     And he was being held down by at least one officer?

17   A     After he was handcuffed, they got off him.

18   Q     And at that point he was having trouble breathing?

19   A     I wouldn't say necessarily he was having problems

20   breathing.

21   Q     You heard sounds coming from his mouth?

22   A     Correct.  That was gurgling.

23   Q     Gurgling sounds?

24   A     Uh-huh.  Yes.

25   Q     And the gurgling was because of fluid in his mouth; right?
```

```
 1   A     Quite probably, yes.

 2   Q     And in his throat?

 3   A     Probable.

 4   Q     And at some point did he ever try to get up or resist the

 5   officers?

 6   A     No.

 7   Q     And he was not able to speak at that time?

 8   A     No, he was not.

 9   Q     Because of his injuries?

10   A     Correct.

11   Q     And you assessed his injuries as very grave; right?

12   A     Correct.

13   Q     And potentially life-threatening?

14   A     Correct.

15   Q     You were concerned he might die?

16   A     Correct.

17   Q     And you didn't know how long it was going to take for him

18   to die?

19   A     I'm not a doctor.  So no.

20   Q     I want to ask you to take a look at the binder in front of

21   you.

22   A     Okay.

23              MR. LITTRELL:  And before we do this, Your Honor,

24   I'd ask the Court -- the government has stipulated to the

25   admissibility of Exhibits 101 and 102 in this binder.
```

1          THE COURT:  101 and 102 are admitted.

2       (Exhibit Nos. 101 and 102 received into evidence.)

3          MR. LITTRELL:  Permission to publish, Your Honor?

4          THE COURT:  You may.

5          MR. LITTRELL:  Actually I want to -- I guess if

6    everyone has got this picture in front of them, I don't need to

7    publish it.

8    Q    I want you to take a look at the picture in Exhibit 101.

9    What do you see there?

10   A    I see the suspect laying on the ground in the recovery

11   position.

12   Q    And what else do you see?

13   A    A pool of coagulated blood.

14   Q    Do you see just one pool, or do you see more than that?

15   A    I guess it's two pools.

16   Q    And when you say "coagulated," what do you mean?

17   A    It's solidifying.  It's not fluid anymore.

18   Q    And there are bodily tissue in addition to blood in those

19   pools; isn't that right?

20   A    It's hard to tell.  These photos are very grainy.

21   Q    And that's the way -- that's the way Mr. Ciancia looked

22   when you first saw him that day; is that right?

23   A    No.  We moved him into this position.

24   Q    Because when you first saw him that day, he was on his

25   face?

```
 1   A      Correct.
 2   Q      And you moved him -- it looks like he's on his back in
 3   this picture; is that right?
 4   A      No.  He's on his side.
 5   Q      And is that the position he was in when you questioned
 6   him?
 7   A      Yes.
 8   Q      At this point when -- you mentioned when you began
 9   questioning him, there was about a dozen people around; right?
10   A      Give or take, yes.
11   Q      And ten of those people were law enforcement officers;
12   right?
13   A      Approximately.
14   Q      All of those law enforcement officers were armed with
15   weapons?
16   A      Correct.
17   Q      All of those officers had their weapons drawn at that
18   point?
19   A      Correct.  We were still clearing the area.
20   Q      And your first priority then was to clear the terminal;
21   right?
22   A      Of course.
23   Q      The way you did that was to have officers search every
24   area of the terminal in your immediate vicinity; right?
25   A      Correct.
```

1    Q     Who did that?

2    A     Several officers as they arrived on scene.  Within two or

3    three minutes, we had easily two dozen officers or more.

4    Q     So within two or three minutes of you actually arriving,

5    there was how many officers you said?

6    A     Easily two dozen or more.

7    Q     And those officers were also armed?

8    A     Correct.

9    Q     And those officers also had their weapons drawn?

10   A     Correct.

11   Q     And several of those officers were surrounding you and

12   Mr. Ciancia at the time you questioned him; right?

13   A     No.  Each were delegated tasks such as clearing the

14   restrooms, clearing the gate area, the jetways.

15   Q     But you didn't question Mr. Ciancia until after those

16   officers had done a preliminary clearing of the gate area;

17   right?

18   A     Of course.

19   Q     Of course what?

20   A     That is correct.  I waited until the other officers

21   cleared the gate area prior to asking Mr. Ciancia some

22   questions.

23   Q     And that took a couple of minutes?

24   A     Quite probably.

25   Q     Was it more than two minutes?

1    A      Probably not.

2    Q      So in less than two minutes from the time you got there,

3    there was two or three dozen officers; right?

4    A      Correct.

5    Q      And the terminal was cleared?

6    A      The terminal was not cleared.

7    Q      The gate area --

8    A      There were sufficient units at the location to address

9    additional issues that may occur or additional threats.

10   Q      So you didn't feel a personal threat to your safety at the

11   time you started questioning Mr. Ciancia?

12   A      Correct.

13   Q      And you didn't feel a threat to the safety of the officers

14   in the gate area at the time you were questioning Mr. Ciancia?

15   A      Not from Mr. Ciancia.  There was a possible additional

16   shooter.  So obviously the best course of action is to get

17   additional information on the possible second shooter.

18   Q      So the questions you were asking were not -- they were

19   designed to identify a possible other shooter?

20   A      Well, it was to try to clarify the situation and figure

21   out whether there were secondary devices, whether there were

22   additional shooters and additional resources that Mr. Ciancia

23   had possibly left behind on his way to the rear of the

24   terminal.

25   Q      And these were all -- these were all possibilities that

**UNITED STATES DISTRICT COURT**

1  you had thought of yourself?

2  A     These are the possibilities that we train for, yes.

3  Q     But these -- there was no objective indication from

4  Mr. Ciancia or this particular case that any of those issues

5  posed a threat to you?

6  A     At that time I was unsure because, like I said, we had

7  just taken Mr. Ciancia into custody.  The situation was dynamic

8  and evolving.

9  Q     Your safe -- you felt personally safe at that time; right?

10  A     With Mr. Ciancia, yes.

11  Q     And you had enough time to give him a Miranda warning;

12  right?

13  A     I imagine so.

14  Q     It would have taken about 15 seconds; right?

15  A     Probably a little longer.

16  Q     No more than 30 seconds?

17  A     Okay.  I'll go with that.

18  Q     And you know the Miranda warnings by heart; right?

19          MS. CURTIS:  Objection, Your Honor.  Relevance.

20          THE COURT:  Relevance, Mr. Littrell?

21          MR. LITTRELL:  To the extent it goes -- it actually

22  goes to the voluntariness inquiry, if it was feasible to give

23  Miranda warnings.

24          THE COURT:  All right.  You may inquire.

25  BY MR. LITTRELL:

Q    So you know the Miranda warnings; right?

A    I am aware of the Miranda warnings.  I do not know them by heart.  I have the Miranda warnings on my officer's notebook back there with me.

Q    And you had that with you that day?

A    Correct.

Q    And you made a deliberate choice not to give a Miranda warning?

A    At that time it didn't cross my mind.  My primary concern was for the safety of the officers and the passengers inside the terminal area.

Q    But not within the immediate gate area that you were in; right?  You felt that area was secure?

A    That's also because we had about three or four dozen officers there at that point.

Q    So you were concerned about a threat in a different part of the airport?

A    That is correct.  LAX is comprised of eight terminals in the central terminal area along with two sets of remote gates.

Q    And you were concerned about a totally different shooter?

A    Quite possibly, yes.  There was multiple reports that there was a possible second shooter.

Q    But you were not concerned about a threat from Mr. Ciancia?

A    No.  I was using --- he was in handcuffs in front of me.

1  Q     What sort of training do you have on the limits of public

2  safety questioning?

3  A     I'm not understanding your question.

4  Q     You mentioned it did not occur to you to read Miranda

5  rights; right?

6  A     Yes.

7  Q     Your concern was for the public safety?

8  A     Correct.

9  Q     Have you had any training about when, if ever, it is

10 permissible to not give a Miranda warning and instead just

11 start asking questions of a criminal suspect?

12 A     Yes.  We've had training like that.

13 Q     And what's your understanding of the purpose and the scope

14 of permissible public safety questioning?

15 A     My understanding is in a dynamic situation such as this,

16 that the safety of the public outweighed the individual right

17 of the suspect as far as asking them questions referenced --

18 articulable facts that can be tied to the safety of the public

19 at large and the officers at the scene.

20 Q     So you felt it was permissible to ask questions about the

21 threat of a totally different shooter in a different part of

22 the airport?

23 A     That is correct.

24 Q     Even though you had no objective indication that there was

25 another shooter?

1    A    There were, again, multiple -- there were multiple

2    witnesses stating that there was a possible second shooter, and

3    I was trying to get additional information from Mr. Ciancia.

4    Q    Your first question for him was whether he had a wallet on

5    him; right?

6    A    Correct.

7    Q    And that wasn't for the purpose of protecting yourself or

8    others, was it?

9    A    Well, inside his wallet he would have his ID.  Part of the

10   identification -- part of the process is to identify who we

11   have.  If the subject is on a terrorism screening list or any

12   other list, if he had other -- if he had known associates or

13   accomplices, those are the first people that we'd be looking

14   for.

15   Q    But you --

16   A    So it was important to identify who he was.

17   Q    He had already been searched -- isn't that right? -- at

18   the time you asked him that question?

19   A    That was a quick physical search for additional weapons.

20   Q    And his driver's license had already been recovered at the

21   time you asked that question; isn't that true?

22   A    Yes.

23   Q    And you asked him it he was the only shooter?

24   A    Correct.

25   Q    And your sworn testimony today is that his answer was no?

1    A    Correct.

2    Q    Meaning that he was not the only shooter?

3    A    Correct.

4    Q    And, now, this declaration from today, you didn't write

5    that declaration yourself; right?

6    A    No.

7    Q    But you read it very carefully?

8    A    Correct.

9    Q    You read it several times?

10   A    Correct.

11   Q    And you swore -- and you swore just today that it was the

12   truth?

13   A    Correct.

14   Q    And this declaration is actually your sworn testimony

15   today?

16   A    Correct.

17   Q    And one of the things that you testified to in your

18   declaration is that, when Mr. Ciancia shook his head, that

19   meant no; right?

20   A    Correct.

21   Q    And when he nodded his head, that meant yes?

22   A    Correct.

23   Q    And that was your understanding on November 1st, 2013?

24   A    Correct.

25   Q    And so it's your testimony today that, when you asked

```
 1   Mr. Ciancia whether he was the only shooter --

 2   A     Correct.

 3   Q     -- he shook his head no?

 4   A     Correct.

 5              THE COURT:  Clarify for the record.  When you say

 6   "nodded" or "shook," it's not clear to me.  But left to

 7   right is -- moving your head left to right is no; moving your

 8   head up and down is yes?

 9              MR. LITTRELL:  That's right.  I'll try to be more

10   clear about that.

11   Q     So, Officer, when I moved my head up and down to indicate

12   nodding, you understand that moving your head up and down like

13   this is nodding and that indicates yes; right?

14   A     That is correct.

15   Q     And moving it left to right like this means no?

16   A     That is correct.

17   Q     And that was how you interpreted that?

18   A     Yes.

19   Q     You were interviewed on November 1st, 2013.  Do you recall

20   that?

21   A     Okay.

22   Q     It was the day of the incident.

23   A     Okay.

24   Q     And there were several detectives from LAPD there; right?

25   A     Right.
```

```
 1   Q     FBI Special Agent Nina Vicencia was also there.  Do you
 2   recall that?
 3   A     Correct.
 4   Q     Now, you told the truth that day; right?
 5   A     Yes.
 6   Q     And you told them everything that you could remember?
 7   A     Correct.
 8   Q     Including the questions that you asked of Mr. Ciancia;
 9   right?
10   A     Correct.
11   Q     And including the answers that he gave you?
12   A     Correct.
13   Q     And isn't it true that when you were asked -- that you
14   told the officers that you asked Mr. Ciancia whether he was a
15   single shooter, and he nodded his head, meaning yes, he was a
16   single shooter?
17   A     Okay.
18   Q     So on the day after -- on the day of the incident, you
19   told investigating authorities that Mr. Ciancia told you that
20   he was a single shooter?
21   A     Correct.
22   Q     And that's in conflict with your testimony today that he
23   denied being a solo shooter; right?
24   A     No.
25   Q     How do you reconcile what you've said in your direct
```

1    testimony declaration -- you said in your direct testimony

2    declaration -- and you have it in front of you.

3    A    Uh-huh.  Yes.

4    Q    The first page, declaration of Daniel Yu, line 25.

5         "QUESTION:"  --

6         Do you see that in front of you?

7    A    Yes.

8    Q    You report -- you testified in this declaration that you

9    asked Mr. Ciancia the question:

10        "QUESTION:  Are you the only shooter?

11        "ANSWER:  No."

12   A    Correct.

13   Q    Meaning that he denied being the only shooter on that day?

14   A    Correct.

15   Q    But when you spoke with LAPD and FBI agents on the day of

16   the shooting --

17   A    Yes.

18   Q    -- you told them that you asked Mr. Ciancia whether he was

19   a single shooter, and he nodded his head, meaning yes, he was a

20   single shooter?

21   A    That is correct.  It was an important enough question that

22   I asked Mr. Ciancia on more than one occasion whether he was

23   the only shooter.

24   Q    And is it your testimony today that he gave inconsistent

25   responses on that day?

A      Yes.

Q      And that was an important question for you that day?

A      Yes.

Q      But it was not an important enough question for you to include in your sworn testimony for today's hearing?

A      I don't understand your question.

Q      Nowhere in your sworn direct testimony for today's hearing do you indicate that Mr. Ciancia told you he was the only shooter; isn't that right?

A      Not in this declaration, no.

Q      And did you tell the prosecutors that he had told you on that day that he was the only shooter?

A      I can't recall.

Q      Didn't you think that was important to bring up with them?

A      Yeah.  Yes.

Q      And in your direct testimony declaration, you state, quote, on paragraph 5:  "The conversation recounted above is, in substance, the entirety of my questioning of the defendant on that day."  Do you see that?

A      Which line is that?

Q      That's line 26 on page 2 of your direct testimony declaration.

A      Okay.

Q      So you told the prosecutors and this Court that the -- that the entire substance -- that the conversation recounted in

```
 1    this direct testimony declaration is, in substance, the

 2    entirety of your questioning of the defendant on that day?

 3    A     Correct.

 4    Q     But nowhere in this declaration do you indicate that

 5    Mr. Ciancia told you that he was the only shooter?

 6    A     No.

 7              MR. LITTRELL:  May I have a moment, Your Honor?

 8              THE COURT:  You may.

 9    BY MR. LITTRELL:

10    Q     You were with Mr. Ciancia for all the way up until his

11    time at the hospital; right?

12    A     Correct.

13    Q     You actually escorted him to the ambulance?

14    A     Correct.

15    Q     And you were in the back of the ambulance?

16    A     Correct.

17    Q     And you actually were bedside at the hospital for some

18    time?

19    A     Correct.

20    Q     I want you to put yourself back in that time where you

21    were escorting the gurney to the ambulance.  Did you say

22    anything to him?

23    A     Yes.

24    Q     What did you say?

25    A     I told him to hold on and that we were going to the
```

1    hospital and that everything would be all right.

2    Q    Did he say anything to you?

3    A    No.

4    Q    And in the back of the ambulance, what was his condition?

5    A    Similar as before.

6    Q    He was actually spitting up broken pieces of his teeth;

7    right?

8    A    Correct.

9    Q    And blood was pooling out of his mouth; right?

10   A    He was spitting up some blood, but there wasn't much

11   pooling.

12   Q    But it was dripping all the way to the floor of the

13   ambulance?

14   A    Yes, there was some blood on the floor of the ambulance.

15   Q    And his tongue was gone?

16   A    Well, I'm not a medical doctor.  It appeared that his

17   tongue was damaged in the shooting and it was hanging out of

18   his mouth a little bit.

19   Q    And you testified earlier that he was experiencing pain?

20   A    I would imagine so.

21   Q    And you could tell that by looking at his facial

22   expression?

23   A    Correct.

24   Q    And you testified earlier that his eyes were very wide

25   open?

```
 1   A     Correct.
 2   Q     He was afraid?
 3   A     I don't know whether he was afraid or in pain.
 4   Q     But his facial expression looked fearful to you?
 5   A     I wouldn't say fearful.  He had a bit -- he had this calm
 6   demeanor to him.
 7   Q     And when you got to the hospital, you actually went with
 8   him to the actual trauma room where he was treated; right?
 9   A     That is correct.
10   Q     He was in the intensive care unit?
11   A     That is correct.
12   Q     And he was immediately -- an IV had been put in his arm in
13   the ambulance; right?
14   A     I can't recall.
15   Q     What was the last that you saw of Mr. Ciancia that day?
16   A     I believe they wheeled him into a room where they were
17   preparing to operate on him.
18   Q     And they were preparing to operate immediately; right?
19   A     If I remember correctly, yes.
20   Q     Did you -- did he say anything else to you?
21   A     No.
22   Q     They sedated him immediately; right?
23   A     I am not a medical professional.  I'm unaware of what
24   medical procedures were done.  I was just there as a, I guess,
25   protective force.
```

```
 1            MR. LITTRELL:  May I have a moment, Your Honor?

 2            THE COURT:  You may.

 3            MR. LITTRELL:  No further questions.

 4            THE COURT:  Just give me a moment.

 5       Okay.  Redirect?

 6            MS. CURTIS:  May I have one moment, Your Honor?

 7            THE COURT:  You may.

 8                         REDIRECT EXAMINATION

 9  BY MS. CURTIS:

10  Q    Officer Yu, at any time during your public safety

11  questions of the defendant, did you point your gun at the

12  defendant?

13  A    No.

14  Q    Were any of the other officers pointing their weapons at

15  the defendant during your questioning?

16  A    No.

17            MS. CURTIS:  Nothing further.

18            THE COURT:  Redirect -- recross, rather?

19            MR. LITTRELL:  No, Your Honor.

20            THE COURT:  You may step down.  Thank you.

21            MS. CURTIS:  Your Honor, we have one more witness,

22  Jeffrey Swegles.

23            THE COURT:  You may.

24            THE CLERK:  Sir, if you could please step forward.

25  Stand next to the court reporter's desk and raise your right
```

1   hand.

2        Do you solemnly swear that the testimony you shall give in

3   the cause now before this Court shall be the truth, the whole

4   truth, and nothing but the truth, so help you God?

5                  THE WITNESS:  I do.

6                  THE CLERK:  Thank you.  Please take a seat.

7                          JEFFREY SWEGLES,

8   called as a witness by the Government, was sworn and testified

9   as follows:

10                       DIRECT EXAMINATION

11  BY MS. CURTIS:

12  Q    Good afternoon, Officer Swegels.

13  A    Good afternoon.

14  Q    Can I have you turn to the manila folder in front of you

15  and locate Government's Exhibit No. 2, please.

16  A    Okay.

17  Q    Do you recognize this document?

18  A    Yes.

19  Q    What is it?

20  A    Declaration, my statement.

21  Q    This is your statement in connection with the hearing this

22  afternoon?

23  A    Yes.

24              MS. CURTIS:  Okay.  Thank you.  I have nothing

25  further.

**UNITED STATES DISTRICT COURT**

1        THE COURT:  Cross?

2                 CROSS-EXAMINATION

3   BY MR. LITTRELL:

4   Q    Good afternoon, Mr. Swegles.

5   A    Good afternoon.

6   Q    Did you have a chance to talk over your testimony today

7   with any of the prosecutors?

8   A    Yes.

9   Q    You and I have not had a chance to talk it over yet?

10  A    No.

11  Q    Were you able to talk it over with any of your colleagues

12  out there in the hallway?

13  A    No.

14  Q    I want you --

15       THE COURT:  Just so the witness knows, has the

16  Government admonished the witnesses outside after the Court

17  issued its order?  I didn't instruct you to, but --

18       MS. CURTIS:  I'll go do that now, Your Honor.

19       THE COURT:  Okay.  Just so we're -- after this

20  moment, you are instructed not to discuss your testimony with

21  any other witnesses.

22       MS. CURTIS:  I have an agent admonishing the

23  witnesses right now.

24       THE COURT:  Okay.

25  BY MR. LITTRELL:

1   Q     I want you to just try to place yourself back on

2   November 1st, 2013, because those are the questions I'm going

3   to be asking you.  Okay?

4         Can you tell me where you were when you first saw

5   Mr. Ciancia that day.

6   A     In Terminal 3 at the airport, LAX.

7   Q     What portion of Terminal 3?

8   A     I believe it's -- it was adjacent to gate 37 or -- I don't

9   remember the exact location, what gate it was adjacent to, but

10  it's at the end of the terminal there.

11  Q     And you had been called to Terminal 3 for a different

12  reason?

13  A     Correct.

14  Q     Not to treat Mr. Ciancia?

15  A     Correct.

16  Q     But to treat somebody with an ankle injury?

17  A     Correct.

18  Q     But you were redirected to Terminal 3?

19  A     So initially how it happened was we were dispatched just

20  slightly after the initial dispatch.  And our dispatch, on the

21  apparatus I was riding, was for an ankle injury for

22  Terminal 3.  But at the time our dispatch center was so

23  overwhelmed that our last transmission with our dispatch center

24  was to be guided by LAPD on scene.

25        So, as we came in field side, which is on the aircraft

```
 1   side, we went to Terminal 3 and married up or kind of
 2   communicated with an LAPD unit which was there at Terminal 3
 3   and told them what we -- what our intent was.  And they got on
 4   the radio and guided us up to the terminal.
 5   Q    And when you first saw Mr. Ciancia, he was on the ground?
 6   A    Correct.
 7   Q    He was handcuffed?
 8   A    Yes.
 9   Q    Behind his back?
10   A    Yes.
11   Q    And he was on his stomach?
12   A    No.  He was -- it was either left lateral or right
13   lateral.
14   Q    But his face was on the ground?
15   A    The side of his face was, but his airway was open.
16   Q    And he was bleeding from his face?
17   A    Yes.
18   Q    More specifically from his mouth?
19   A    Yes.
20   Q    But he had several gunshot wounds to his head; right?
21   A    Correct.
22   Q    There were three gunshot wounds?
23   A    I believe so.
24   Q    And one of the gunshot wounds went all the way through his
25   cheek and through his tongue; right?
```

1   A      Yes.

2   Q      And the other one grazed his forehead?

3   A      Yes.

4   Q      And another one hit his cheek in a different area; right?

5   A      I believe one was above the mustache line, one was below

6   the mustache line.

7   Q      These were potentially life-threatening injuries?

8   A      They could be.

9   Q      It certainly looked to you on that day that they were;

10  right?

11  A      Initially we came on -- you know, it was a surprise to

12  have that patient, first of all, when you are responding to an

13  ankle injury and, secondly, you know, to see the significant

14  blood loss that he had.  But he was surprisingly alert and

15  aware of what was going on when we got there for his injuries.

16  Q      I want you to take a look at the binder in front of you,

17  what's been marked as Defendant's Exhibit 101.  Do you see

18  that?  It's in a binder.

19  A      Oh, okay, a binder.  Okay.

20  Q      Now, when you say there was "significant blood loss," you

21  were referring to the blood that you see in this picture;

22  right?

23  A      Correct.

24  Q      And when you say "significant," we are talking about more

25  than a liter of blood?

```
 1   A      Yes.

 2   Q      More than two liters?

 3   A      You know, I'm not sure approximate-wise what that would be

 4   because it spread across the floor.  I couldn't tell you the

 5   exact volume.

 6   Q      And Mr. Ciancia is very slightly built; isn't that right?

 7   A      Yes, he was.  At that time, yes, he was --

 8   Q      So a two-liter blood loss would be a pretty significant

 9   amount of blood loss?

10   A      It could be for that patient.

11   Q      And so when you said he was -- I believe you said he was

12   surprisingly coherent?

13   A      Yeah.

14   Q      The reason that was surprising is because of the severity

15   of his injuries; right?

16   A      Just looking -- I've been with the department for a while.

17   I was assigned at places we had a lot of gunshot wounds in

18   multiple -- you know, multiple places, face, body, wherever.

19   But just initially seeing that and seeing it was a gunshot

20   wound, I'm thinking, wow, this is not going to be good.  And

21   then actually coming up to him and realizing, wow, he is still

22   coherent.  He's still able -- he's able to kind of communicate

23   with us through nodding motions or -- which I was surprised I

24   remember that day.

25   Q      That was even though his mouth was filling with blood;
```

1    right?

2    A    Yeah.

3    Q    And there was a threat that he was going to aspirate the

4    blood; right?

5    A    He could have, yeah.  That's why -- I think that's why

6    initially -- which was good for the LA Live Wire or LAPD,

7    whoever put him in that position.  That's typically recovery

8    position for him.  It kind of protects the airway.  If he was

9    straight on his back, that wouldn't have been good.  He would

10   have aspirated.  But that was a good position for him to be in

11   when we first got there.

12   Q    I want you to take a look at Defendant's Exhibit 102.

13   What do you see there?

14   A    It's a closer shot, kind of the same as the first one but

15   a closer shot.  You can see the blood on his face.  You can see

16   some of the entrance wounds on his face.

17   Q    And you can actually see straight down into his mouth;

18   isn't that right?

19   A    Correct.

20   Q    Because he's laying on his back?

21   A    Okay.

22   Q    Isn't that true?

23   A    I can't tell the orientation.  I don't know if he's

24   straight on his back.  It looks like he's kind of tilted to one

25   side a little bit, but yeah, he's more towards his back.

1   Q    This is a very dangerous recovery position for someone in

2   his condition.  Wouldn't you agree?

3   A    It could be, but I think that was maybe for the picture,

4   you know, for picture-wise they maybe turn him like that for a

5   minute, take a picture.  I'm not sure.  But yeah, that wouldn't

6   be a good position for him to be in for a long time.

7   Q    It would not be a good position?

8   A    Not for a long time.

9   Q    But you don't know what position he was in before you got

10  there?

11  A    No, I said before -- oh, before, yeah.  Oh, no, I don't

12  know that because I wasn't there.

13  Q    But we know that at the time this photograph was taken he

14  was on his back; right?

15  A    Yes, he was in this position here.

16  Q    And he was having trouble breathing generally?

17  A    Yes.

18  Q    And he could not speak?

19  A    No.  He couldn't make words, no.

20  Q    And when you testified in your declaration that he's

21  conscious, you meant that his eyes were open; right?

22  A    Conscious meaning eyes were open, able to follow a

23  response -- or follow like a command.  So at a question, he can

24  give us a response by nodding his head yes or no.

25  Q    And when you testified that he was oriented -- being

1    oriented is sort of a term of art in your profession; isn't

2    that right?

3    A    Correct.

4    Q    And there's three ways to be oriented; right?

5    A    Correct.

6    Q    And that's oriented as to person; right?

7    A    Correct.

8    Q    Oriented as to place?

9    A    Uh-huh.

10   Q    And oriented as to time?

11   A    Correct.

12   Q    And you testified that he was oriented when you saw him?

13   A    Yes.

14   Q    But you don't know if he knows -- if he knew at that point

15   where he was?

16   A    We didn't ask him that.

17   Q    So you don't know?

18   A    No.

19   Q    So you don't know if he was oriented as to the place?

20   A    Well, he was oriented as in he was oriented to --

21   orientation meaning like -- you know, you talk to a patient.

22   You realize when you come into a room are they nonresponsive,

23   are they not oriented toward you, are they not listening to

24   your commands, or are they -- are they, you know, oriented to

25   where -- yeah, I didn't ask him, you know, do you know where

1    you are right now, do you -- you know, what day it is, do

2    you --

3    Q    But those are standard questions you would ask a patient

4    to determine whether they are oriented; right?

5    A    Correct.

6    Q    And you didn't ask him?

7    A    I personally did not ask him.

8    Q    And when you testified he was alert, you meant that he was

9    able to follow some basic commands --

10   A    Correct.

11   Q    -- you gave him; right?  But you don't know if he could

12   have gone beyond that?

13   A    Repeat the question.

14   Q    You didn't ask him to do anything more than a basic

15   command; right?

16   A    We just were more or less just asking him if he could

17   breathe, you know, is there anything I can do to make you more

18   comfortable, is there any -- you know, kind of basic questions

19   to assess the patient.

20   Q    You didn't ask him whether he was in pain?

21   A    You know, I personally didn't.  The thing -- let me get

22   this straight this way.  So when we got on, when we kind of

23   operate on a rescue, one person is the patient person.  One

24   person might be the communications or, you know, radio

25   operator.

1    So on that particular day I was attendant, which means

2    that I'm radio operator.  So James Bizzini, who is out in the

3    lobby, you can ask him.  He was the patient guy that day.  He

4    was driver.  He's the patient guy.  So James was more asking

5    orientation -- you know, orientation questions, stuff like

6    that.

7    Q    So you don't personally know whether the defendant was

8    oriented?

9    A    I'm just -- did you hear what I said?  I said my

10   orientation was, when I initially saw him on the ground, yes,

11   he was looking at me.  Yes, he was responding to our commands.

12   So his orientation to me was, yes, he was oriented in the fact

13   that he was awake, alert, and responding to commands.

14       Now, the orientation you are talking about, orientation

15   times one, two, and three, person, place, time and all that,

16   that doesn't concern me at this point.  You know, my chief

17   concern at this point was his airway.  Was it open?  Was he

18   alert?  That was my chief concern.

19   Q    So when you testified in your direct testimony declaration

20   that he was oriented, you did not mean to imply that he knew

21   where he was?

22   A    I didn't imply I was doing the orientation times three.

23   Q    And you didn't mean to imply that he knew who he was?

24   A    I didn't ask him that question.

25   Q    So you don't know the answer?

```
 1   A     I didn't ask him that question.

 2   Q     And you don't know whether he was experiencing severe

 3   pain?

 4   A     You know, like I said, I didn't ask him all these

 5   questions.  You can ask James Bizzini who was the patient guy.

 6   Q     Okay.  So you don't know?

 7   A     I don't know.

 8   Q     So when you -- you did observe, however, that he was

 9   somewhat pale; right?

10   A     Correct.

11   Q     And you observed that he was in some distress?

12   A     Correct.

13   Q     And you observed that he had low blood pressure?

14   A     That's the part I don't remember because I'm not sure if

15   we actually obtained a vital at the point that we had him or

16   later on when the paramedics got there.

17   Q     And pale -- and pale skin is a symptom of shock?

18   A     Correct.

19   Q     And trauma, especially from a gunshot wound, can trigger

20   shock; right?

21   A     Absolutely.

22   Q     And shock can affect somebody's ability to comprehend

23   what's going on around him?

24   A     It could.

25           MR. LITTRELL:  May I have a moment, Your Honor?
```

```
 1                THE COURT:  You may.

 2                MR. LITTRELL:  No further questions.

 3                THE COURT:  Redirect?

 4                MS. CURTIS:  Very briefly.

 5                     REDIRECT EXAMINATION

 6   BY MS. CURTIS:

 7   Q    Officer Swegels, you weren't present when Officer Yu asked

 8   the defendant the public safety questions, were you?

 9   A    No.

10   Q    And is it fair to say that someone with a gunshot wound to

11   the face, his medical condition could change minute by minute?

12   A    Yes.

13                MS. CURTIS:  I have nothing further, Your Honor.

14                THE COURT:  Recross?

15                     RECROSS-EXAMINATION

16   BY MR. LITTRELL:

17   Q    The questioning by Officer Yu happened before you came on

18   the scene -- right? -- if you know?

19   A    Yes, I think so.

20   Q    And you testified somebody with a gunshot wound, their

21   condition can change from minute to minute?

22   A    Correct.

23   Q    Would you expect that condition to get better without

24   treatment?

25   A    No, get worse.
```

**UNITED STATES DISTRICT COURT**

```
 1              MR. LITTRELL:  No further questions.
 2              THE COURT:  You may step down.  You may step down.
 3    Thank you.
 4              MS. CURTIS:  I forgot to ask.  Are these witnesses
 5    free to go, Your Honor?
 6              THE COURT:  May the witness be excused?
 7              MR. LITTRELL:  Yes.
 8              THE COURT:  As well as Officer Yu?
 9              MR. LITTRELL:  Yes, Your Honor.
10              THE COURT:  They may be excused.
11              MS. CURTIS:  Thank you.
12              MR. LITTRELL:  It might make sense to repeat the
13    admonishment now.
14              THE COURT:  I thought I did, but if I didn't --
15              MS. CURTIS:  Officer Swegels, please don't discuss
16    your testimony with any of the other officers outside.  Thank
17    you.
18         Your Honor, with that testimony, the government at this
19    time will move to admit Government's Exhibits 1, 2, and 3.  3
20    is a 902 declaration with some of the defendant's medical
21    records, the relevant portions of the records being the first
22    and second page of the records.  And we would move to admit
23    these into evidence.
24              THE COURT:  Any objection?
25              MR. LITTRELL:  May I have a moment, Your Honor?
```

1              THE COURT:  1, 2, and 3?

2              MS. CURTIS:  Yes, Your Honor.

3              THE COURT:  3 is new; correct?

4              MS. CURTIS:  Yes.  3 is the 902(11) declaration that

5    you haven't heard about yet today.

6              THE COURT:  Okay.

7              MR. LITTRELL:  No objection, Your Honor.

8              THE COURT:  1, 2, 3 admitted.

9         (Exhibit Nos. 1, 2, and 3 received into evidence.)

10             MR. LITTRELL:  Subject to previous objections about

11   the use of medical records and the discovery of medical records

12   in this case.  I think the Court has ruled on those.  So

13   without waiving those objections.

14             THE COURT:  I understand.  Thank you.

15             MS. CURTIS:  With that, the government would rest.

16             THE COURT:  All right.

17             MS. CURTIS:  But I understand the defense has

18   subpoenaed a number of officers who I believe their testimony

19   is mostly going to be cumulative, and I would ask for an offer

20   of proof.

21             THE COURT:  Well, at this point, do you intend to

22   call any witnesses, Mr. Littrell?

23             MR. LITTRELL:  I'd like to take just a five-minute

24   break to assess that, Your Honor.

25             THE COURT:  Okay.  You may.

```
1              (A brief recess was taken.)

2              THE CLERK:  Please raise your right hand.  Do you

3    solemnly swear that the testimony you shall give in the cause

4    now before this Court shall be the truth, the whole truth, and

5    nothing but the truth, so help you God?

6              THE WITNESS:  I do.

7              THE CLERK:  Thank you.

8              THE COURT:  Mr. Littrell, have you made a

9    determination how many witnesses you are going to call?

10             MR. LITTRELL:  We are going to call one witness,

11   Sergeant Zouzounis.

12             THE COURT:  Go ahead.

13                      STEVE ZOUZOUNIS,

14   called as a witness by the defense, was sworn and testified as

15   follows:

16                    DIRECT EXAMINATION

17   BY MR. LITTRELL:

18   Q    Good afternoon, Sergeant Zouzounis.

19   A    Good afternoon.

20   Q    You and I just had a chance briefly to talk about what

21   happened that day at the airport; right?

22             THE COURT:  I'm sorry.  Did you give the spelling of

23   your last name?

24             THE WITNESS:  Z-o-u-z-o-u-n-i-s.

25             MR. LITTRELL:  May I proceed, Your Honor?
```

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Yes.
 2   BY MR. LITTRELL:
 3   Q    You and I spoke briefly in the hallway just now; right?
 4   A    That's right.
 5   Q    And we talked about what happened on November 1st, 2013?
 6   A    Yes.
 7   Q    But prior to that we had not spoken in detail about the
 8   incident; right?
 9   A    No.
10   Q    We spoke by phone, but you said you wanted to have a
11   prosecutor present when you spoke with me; right?
12   A    Yes.
13   Q    You offered to come and meet with me in advance?
14   A    Yes, I did.
15   Q    So I want you to place yourself back where you were on
16   November 1st, 2013, when you first came across Mr. Ciancia.
17   Okay?
18   A    Yes.
19   Q    And explain what happened as you approached the gate area
20   in Terminal 3.
21   A    As I approached the gate area, I saw the defendant walking
22   eastbound holding a rifle.
23   Q    And you shot him?
24   A    I shot at him.
25   Q    And the time between when you first saw him and the time
```

```
1    that you shot at him, how long did that take?

2    A    One or two seconds.

3              THE COURT:  Mr. Littrell, can you move the

4    microphone closer to you.  You're fading out.

5    BY MR. LITTRELL:

6    Q    So the time elapsed between the time you first saw

7    Mr. Ciancia and the time you shot at him was one or two

8    seconds?

9    A    It was very quickly.

10   Q    And then you immediately -- you took cover?

11   A    Eventually, yes.

12   Q    And at some point Mr. Ciancia was -- you shot at him

13   again?

14   A    Yes.

15   Q    And he went down; right?

16   A    I did not observe that, but yes.

17   Q    And then after that point you approached him?

18   A    Yes.

19   Q    Tell me what you saw when you first approached Mr. Ciancia

20   when he was on the ground.

21   A    I saw him with a facial wound laying semi on top of the

22   rifle he was in possession of and appeared to be incapacitated.

23   Q    And he had gunshot wounds in his face?

24   A    He had facial damage, yes.

25   Q    And what did you do?
```

1    A    I visually scanned him.  Seeing what I saw to be a

2    load-bearing-type vest, I was suspicious of a possible IED,

3    improvised explosive device.  And I visually tried to determine

4    that there was none before I let my officers approach.

5    Q    You mentioned a load-bearing vest?

6    A    He had a tactical-type vest on, yes.

7    Q    Can you describe the tactical-type vest he was wearing.

8    A    It's a black vest that has a cargo area or can hold items

9    in the --

10   Q    By "cargo area," do you mean pockets?

11   A    Pockets, correct, yes.

12   Q    How many pockets were on the tactical vest he was wearing?

13   A    I'm guessing possibly six.

14   Q    Is it possible there were more pockets than six?

15   A    I can't recall.

16   Q    Is it possible there were fewer than six pockets?

17   A    It's possible.

18   Q    And this was black in color, you said?

19   A    I believe so.

20   Q    And what else was he wearing?

21   A    It appeared to be standard pants and shirt that any

22   citizen would wear.

23   Q    What color was the shirt?

24   A    I believe it was some type of tan or beige or -- I don't

25   know.

```
 1   Q     So did the tactical vest stand out to you?

 2   A     Yes.

 3   Q     Why?

 4   A     Because of its color and because I recognize it from

 5   detective-type, entry-type police vests.  It's similar in that

 6   fashion.

 7   Q     So this was a police-type tactical vest?

 8   A     Military or police fashion, yes.

 9   Q     And explain in as much detail as you can remember what the

10   vest looked like.

11   A      It wasn't as detailed as some detective vests as detective

12   vests feature different characteristics that hold different

13   items.  If I recall correctly, after seeing it for just a brief

14   time, this one was mostly just for magazines which -- AR-15

15   style, magazines for the rifle.

16   Q     And what, if anything, did you do with that vest?

17               MS. CURTIS:  Your Honor, I'm going to object at this

18   point as irrelevant.  This whole line of questioning is

19   irrelevant as to whether or not the statements were voluntary.

20               THE COURT:  What's the relevance to the public

21   safety exception and the voluntariness?

22               MR. LITTRELL:  It goes to ability to remember.  I'd

23   be happy to explain more at sidebar.

24               THE COURT:  You may proceed.

25   BY MR. LITTRELL:
```

1  Q    What, if anything, did you do with this tactical-style

2  military vest?

3  A    I don't know that -- I believe the magazines were removed.

4  I think it was left on him as -- we handcuffed him, and at that

5  point it's -- without cutting it off, we didn't want to disturb

6  it.  So we left it on, I believe.

7  Q    You left the tactical vest on?

8  A    I believe.

9  Q    Why is that?

10  A    Because our -- our immediate concern was to incapacitate

11  him or to restrain him to make sure that he couldn't do any

12  harm to anyone with handcuffs.  Once that's done, it's

13  impossible to get the vest off without destroying it,

14  disturbing it.  I didn't appear to see any explosive device on

15  it, but without -- you know, I mean, it's just -- there's

16  not -- if it's not necessary to cut it, there would have been

17  no way to remove it except unhandcuff him, and that's not

18  prudent.  So it's better to leave it in place until -- until

19  experts can arrive.

20  Q    And you said you didn't want to destroy or disturb the

21  vest?

22  A    There were a lot of priorities, sir.  And at that point,

23  if it's not an IED, it's evidentiary, and you don't want to --

24  you don't want to disturb as little as possible.

25  Q    When you say "it's evidentiary," what do you mean by that?

1    A    At that point immediate safety concerns were our only

2    concern.  And if it wasn't to do with that, I was -- we had a

3    lot of other priorities such as we believed there was possibly

4    more than one shooter.  So I just couldn't be bothered with

5    those details.

6    Q    But you wanted to make sure the vest was preserved?

7    A    Yes, I guess.  I mean, I didn't really process that, sir.

8    I can't -- I didn't consciously necessarily make a real

9    decision with that.  It was a fleeting, quick decision.  We did

10   what we had to do to prioritize, and I moved on.

11   Q    And so he was handcuffed; right?

12   A    Yes.

13   Q    Behind his back?

14   A    Yes.

15   Q    And he was making gurgling noises -- right? --

16   Mr. Ciancia?

17   A    I think that was just from breathing, I think, due to the

18   location of the wound, I believe.  Yes, there were noises on

19   occasion.

20   Q    And that was blood pooling in his throat; right?

21   A    I am not a doctor, sir.  I don't know.

22   Q    At some point -- was he cooperative?

23   A    Yes.

24   Q    Did he ever try to get up?

25   A    No.

```
1   Q     And you were the first person that actually spoke to
2   Mr. Ciancia; is that correct?
3   A     I'm not sure.  I believe I may have been.
4   Q     And he was in custody at that time when you spoke to him?
5   A     He was detained with handcuffs, yes.
6   Q     And he was -- and he had had those gunshot wounds to his
7   face?
8   A     Yes.
9   Q     And you were concerned at that time about the suspect's
10  breathing?
11  A     No.
12  Q     No?  You --
13  A     I mean, certainly an injured person we care about and --
14  but he didn't appear to be in distress.  He was lucid and okay,
15  yeah.
16  Q     But isn't it true you were concerned about this suspect's
17  breathing at the time you interviewed him?
18  A     He appeared to be breathing without difficulty.
19  Q     So your testimony is you were not concerned about his
20  breathing?
21  A     Well, of course I'm concerned about -- breathing is a
22  basic fundamental thing that anybody with an injury you're
23  concerned about, but when they are breathing okay, I wasn't
24  concerned necessarily about his breathing.
25  Q     You were interviewed by the FBI shortly after this
```

 1    incident.  Do you recall that?

 2    A     Yes.

 3    Q     And you were asked a number of questions about what

 4    happened --

 5    A     Yes.

 6    Q     -- on that day?

 7          May I approach, Your Honor?

 8                THE COURT:  You may.

 9                MR. LITTRELL:  May I approach, Your Honor?

10                THE COURT:  Yes.

11    BY MR. LITTRELL:

12    Q     If you could take a look at page 5 of that document at the

13    second paragraph to the bottom.  Do you see that?

14    A     I'm sorry.  Let me make sure I'm on page 5.  Oh, second to

15    last.  Yes.

16    Q     Now, on that date when you were interviewed, you said to

17    the FBI that you were concerned about the suspect's breathing

18    and you moved his head to ease his breathing?

19    A     I'm sorry, sir.  You asked me once he was handcuffed I

20    was -- you asked me if once he was handcuffed, was I concerned

21    about his breathing.  This was some time later.

22    Q     Okay.

23    A     Yes.  His breathing changed.

24    Q     So his breathing changed at some point?

25    A     It appeared to me, yes.

1    Q     Can you explain that.

2    A     I had left to do some other duties, and when I returned,

3    his condition appeared to be a little bit different than I

4    recalled.  His breathing appeared to be a little bit more with

5    difficulty.  He just didn't appear to be as -- doing as well.

6    Q     At that point was he -- what position was he in?

7    A     We call it recovery position on his right side.  But his

8    head was quite angled, and it looked uncomfortable to me, and

9    it also looked as though he was not breathing well.

10   Q     And you asked him -- you were concerned he might die;

11   right?

12   A     I think with anyone of the gravity of injury that he had,

13   of course I was very concerned for his well-being.  But it was

14   the difference in condition and the labored -- little bit

15   labored breathing.  I think the blood might have coagulated

16   more.  And I was a little bit, yes, concerned more then at that

17   time for his safety, yes.

18   Q     You were just trying to keep him alive; right?

19   A     Yeah, but I'm not exactly an EMT, but I did what I thought

20   made sense at the time.  And I asked him if I could raise his

21   head because he looked uncomfortable, and he nodded

22   affirmative.  So I did so.

23   Q     Because you were concerned about his condition?

24   A     Yes.

25   Q     Because he had a grave injury?

1   A     Yes.

2   Q     That was potentially life-threatening?

3   A     Yes.

4   Q     And that was the condition he was in when you started

5   asking him questions; right?

6   A     No, sir.  That was the only question at that time was if

7   he wanted me to raise his head.

8   Q     But at the time you asked him questions, he had a grave

9   injury; right?

10  A     Yes.

11  Q     It was potentially life-threatening?

12  A     Yes.

13  Q     And he had lost a lot of blood?

14  A     Initially it wasn't as much, but --

15  Q     And you asked him whether he was alone?

16  A     Yes.

17  Q     And he said, "I'm alone"?

18  A     Yes.

19  Q     And he was able to speak at that time?

20  A     Mouth words.  We were able to understand him.  The

21  speaking was obviously difficult.  But we clearly could

22  understand him, yes.

23  Q     But you didn't believe him?

24  A     No.

25  Q     And that's why you confronted him?

```
 1   A     I don't know what you mean by confronting, sir.

 2   Q     What did you say after he told you he was alone?

 3   A     I asked him again because I didn't necessarily believe

 4   him.  I mean, a lot of suspects lie.  And so I asked him again.

 5   Q     And what did he say?

 6   A     He said he's alone.

 7   Q     And then what did you say?

 8   A     I believe I only asked a couple times, and after that I

 9   kind of gave up.  I went on to other duties.

10   Q     Did you say anything else to him?

11   A     Well, the first time I asked, and he had declined.  The

12   second time I may have said -- used a vulgarity and said,

13   "You're a fucking liar" or something like that.

14   Q     Well --

15              THE COURT:  When you say "he declined," does that

16   mean he was not responsive or --

17              THE WITNESS:  No.  He said he's alone.  And then

18   when I asked him the second time, I may have said, "You're a

19   fucking liar" or "You're a liar," and I asked him again, and he

20   said, "I'm alone," and then I -- it seemed to me he was going

21   to stick with that story, and then I discontinued any further

22   questioning.

23   BY MR. LITTRELL:

24   Q     But you didn't use any vulgarities?

25   A     No, I may have -- I may -- I can't recall exactly, sir.  I
```

```
 1  said "He's a liar" or "You're a fucking liar," similar to that.
 2  Q    But there was no other indication that he wasn't
 3  cooperating with you?
 4  A    Actually, he was very cooperative.
 5  Q    And at that point the gate area had been cleared; is that
 6  true?
 7  A    No, sir.  Actually, I think I designated officers to do
 8  that, several.  And then several stayed with -- at the location
 9  with the suspect.  But we were still very much active and
10  worried.
11  Q    The place where you questioned Mr. Ciancia was out in the
12  open; right?
13  A    Right.
14  Q    So was there any threat someone would pop out and shoot
15  you while you were questioning him?
16  A    We -- we -- I designated two or three of the officers
17  to -- I mean, we visually cleared it.  But there certainly was
18  an opportunity, yeah.
19  Q    And -- but Mr. Ciancia's answer that he was alone did not
20  change your response to the threat in any way, did it?
21  A    Well, I don't think it's any secret that people may or may
22  not tell you the truth.  But on occasion they do.  So it was --
23  it was what we needed to ask.  I did -- and every bit of
24  information is information.  It's either good or bad, but it's
25  information.  So I did relay his statements over the radio so
```

```
 1   other people could hear.  I'm not sure that it had significant

 2   impact of what we did.  But it was information that's processed

 3   and utilized by all law enforcement that day.

 4   Q    The information he gave you did not alter how law

 5   enforcement responded to the situation; is that correct?

 6   A    I can't answer that.

 7   Q    Well, you were interviewed on October 5, 2015, about

 8   two weeks ago.  Do you recall that?

 9   A    Yes.

10   Q    You were interviewed by Special Agents Vicencia and Gates?

11   A    Yes.

12   Q    And they asked you about the same types of questions I'm

13   asking you; right?

14   A    Yes, sir.

15   Q    And they asked you specifically about your questioning of

16   Mr. Ciancia; right?

17   A    Yes.

18   Q    And they asked you specifically whether the information he

19   gave you altered how law enforcement responded to the

20   situation; right?

21        May I approach, Your Honor?

22   A    Sir, was it -- did he ask -- alter my response or other

23   people's?  Because I can't answer for other people.  I don't

24   know what was done.

25   Q    They asked you whether the information Ciancia gave
```

1    altered how law enforcement responded to the situation; right?

2    A    Perhaps I interpreted that to mean myself.  But I don't

3    know.  There were 500 officers there that day, and I don't know

4    what they did with the information that I broadcast.  But for

5    me it didn't necessarily alter what we did.

6              MR. LITTRELL:  May I approach, Your Honor?

7              THE COURT:  You may.

8              MR. LITTRELL:  I haven't marked these.  I'll mark

9    the other one I used.  This is -- I'll mark it for

10   identification as Defense Exhibit 106, and we'll save as 105

11   the previous exhibit I used, and this is a --

12             THE COURT:  Can you identify the previous exhibit.

13             MR. LITTRELL:  I used it to impeach, Your Honor.

14             THE COURT:  Right.  Okay.  But when you say 105,

15   then I don't know what it goes to.

16             MR. LITTRELL:  I'll clear that up later.

17             THE COURT:  Okay.  All right.

18             MR. LITTRELL:  This is a copy of 106.  This is a 302

19   of Steve Zouzounis from an investigation dated 10/5/2015.  Date

20   of entry is 10/13/2015.

21   Q    If you could take a look at page --

22             THE COURT:  Mr. Littrell, can you keep your voice up

23   for me.

24   BY MR. LITTRELL:

25   Q    If you could take a look at page 2, the second paragraph,

```
 1   the third line from the bottom.  Do you see that?
 2   A    I just -- I do see the answer.  But, I mean, I guess I was
 3   interpreting it to mean as my and my officers' response.  I
 4   don't think it's reasonable for me to be able to answer as to
 5   what the rest of the agency did as I wasn't -- wasn't -- that's
 6   just not reasonable to assume that, sir, I don't think.
 7   Q    So is it true or is it not true that you told FBI agents
 8   that the information Ciancia gave did not alter how law
 9   enforcement responded to the situation?
10   A    With respect to my officers on the immediate scene, yes,
11   that's correct.
12   Q    That's what you said?
13   A    With -- with result to my officers on the immediate scene
14   at the end of the terminal, that's correct.
15                MR. LITTRELL:  May I have a moment, Your Honor?
16                THE COURT:  You may.
17                MR. LITTRELL:  No more questions, Your Honor.
18                THE COURT:  Cross?
19                MS. CURTIS:  Just very briefly, Your Honor.
20                      CROSS-EXAMINATION
21   BY MS. CURTIS:
22   Q    Good afternoon, Officer Zouzounis -- Sergeant Zouzounis.
23   Excuse me.
24   A    Good afternoon.
25   Q    At the time that -- after you shot the defendant, were you
```

**UNITED STATES DISTRICT COURT**

```
 1  receiving radio calls or could you hear radio traffic?
 2  A     Yes.
 3  Q     And, in fact, there were radio reports that there was
 4  another shooter; correct?
 5  A     Yes, there was.
 6  Q     And you were concerned that there was another shooter?
 7  A     Very much so.
 8  Q     And all the officers were concerned there was another
 9  shooter?
10  A     Yes.
11  Q     In the gate area, there were lots of passengers in the
12  area; correct?
13  A     Yes.
14             MS. CURTIS:  Nothing further.
15             THE COURT:  Redirect?
16                       REDIRECT EXAMINATION
17  BY MR. LITTRELL:
18  Q     When you testified there's lots of passengers in the gate
19  area, none of those passengers were within 50 feet of where you
20  were; right?
21  A     Very close to that.
22  Q     About 50 feet away?
23  A     At maximum, I would say.
24  Q     Were you concerned for their safety?
25  A     Yes.
```

```
 1   Q    You weren't concerned that Mr. Ciancia would do anything

 2   to harm them?

 3   A    At what point, sir?

 4   Q    At any point when you got -- after the point -- after the

 5   point where he was disarmed and handcuffed, at that point he

 6   did not pose a threat to those passengers; right?

 7   A    No.

 8   Q    And you had cleared the terminal area to the point where

 9   you felt safe questioning him; right?

10   A    In that immediate area only, yes.

11   Q    So --

12           MR. LITTRELL:  Okay.  No further questions.

13           THE COURT:  Anything further?

14           MS. CURTIS:  No, Your Honor.

15           THE COURT:  Please step down.  Thank you.

16           THE WITNESS:  Thank you.  These documents, leave

17   them here?

18           MR. LITTRELL:  That's fine.

19           MS. CURTIS:  May this witness be excused?

20           THE COURT:  You may.  Any additional witnesses from

21   the defense?

22           MR. LITTRELL:  No.

23           THE COURT:  Any additional witnesses from the

24   government?

25           MS. CURTIS:  No, Your Honor.
```

**UNITED STATES DISTRICT COURT**

 1          THE COURT:  There's a couple ways we can do it.  We

 2    can argue it today.  I'm prepared to do that.  If you want to

 3    wait to get a transcript and submit some type of supplemental

 4    briefing, I'm open to that as well.

 5       Mr. Littrell?

 6          MR. LITTRELL:  We are prepared to argue the motion

 7    today, Your Honor.

 8          THE COURT:  All right.  Government?

 9          MS. CURTIS:  I think it's the defendant's motion.

10    But if the Court would like me to go first, I'm happy to do

11    that.

12          THE COURT:  No, no, I said whether -- just the

13    procedure, whether we want to have argument today, or do you

14    want to get a transcript and submit supplemental briefing?

15          MS. CURTIS:  We are ready to argue.

16          THE COURT:  All right.  You may.

17          MR. LITTRELL:  Your Honor, I'm going to go in the

18    order of the issues presented in the motion even though I think

19    that in most respects the voluntariness issue is the most

20    important.

21       I want to start with concessions from the government.

22    They have conceded that this was a custodial interrogation,

23    which is pretty obvious, and the witnesses bore that out.  So

24    the only issue in terms of the Miranda question is whether the

25    public safety exception justifies these questioning.

1           The facts, as they came out at the hearing, were not very
2    surprising.  And I think perhaps the most important fact is
3    just Mr. Ciancia's condition as displayed in Exhibits 101 and
4    102.  This is the person that was staring back at the officers.
5    This is the person whose condition they were describing.  This
6    is a person who was seriously wounded.  I think all of the
7    witnesses testified that there was a risk that he might die.
8    This was someone who was disarmed without any question, who had
9    been identified by a search that revealed his license.
10          The terminal had been cleared.  And by cleared, I mean --
11   I think Officer Yu was the most clear witness on this.  At the
12   point he knelt down with Mr. Ciancia to ask questions, he had
13   to have enough confidence that there was nobody that could come
14   out and shoot at him.
15          So I think that it's safe to infer and I think that he
16   came out and said that the terminal had been cleared.  Although
17   Zouzounis was not as clear -- as specific on that issue, there
18   was no threat to anybody within arm's length.
19              THE COURT:  Would the public exception be that
20   limited in terms of there was some discussion about other
21   terminals, other places where there might be another shooter or
22   another explosive device of some kind somewhere remote than the
23   immediate area where Mr. Ciancia was.
24              MR. LITTRELL:  That's the real question.
25          And the -- because that's -- and I think -- and I'll just

1    say one more fact that I think is salient.  Officer Yu

2    testified that there was at first 12 and then, I think,

3    something like two or three dozen officers there all armed.  So

4    there was no threat immediately.  So the question then is --

5              THE COURT:  I think I agree with you.  There's no

6    specific threat that Mr. Ciancia himself is going to do

7    anything in that general area to harm anybody at that point in

8    time.

9              MR. LITTRELL:  Nor is there any threat that he's

10   going to communicate with anyone, nor is there -- so the only

11   threat that would possibly justify public safety questions is a

12   threat was completely invented and maybe reasonably so.  It may

13   be reasonable for officers to think it's possible that there's

14   another -- that there's a much more involved plot with another

15   shooter in another terminal.

16       But there's no case law that I can think -- that I saw

17   that justifies public safety questioning based on a completely

18   invented scenario, whether it's reasonable or not.  Public

19   safety questioning -- and you know we get the public safety

20   exception from the *Quarles* case.

21       That was a case where police were concerned because of a

22   very specific fact that there was a gun in the grocery store.

23   They were concerned about it because witnesses actually saw the

24   defendant place the gun in the grocery store.  So they were

25   concerned about the defendant getting to the gun and they were

1    concerned about shoppers getting to the gun.  So that's where
2    this exception began.
3        In all the other cases that they apply that exception that
4    I can find in this circuit, it's all similar scenarios.
5    There's a specific tip that there's a weapon nearby, and
6    law enforcement has to ask about that weapon.  So those cases
7    would not control here because the weapon in this case is
8    clearly disarmed.  The suspect is clearly disarmed.  There's
9    nothing that this suspect could do.
10        So the government did cite some cases from other
11    circuits -- I believe it was the Second Circuit -- and sort of
12    implying that the public safety question goes further than that
13    and allows for a sort of -- a wider ranging set of questions to
14    uncover hidden plots.
15        But they can't -- I think I addressed this in my briefing.
16    Those cases don't apply here for a couple of reasons.  One is
17    in the one case -- I think it was *Abdulmutallab* -- the
18    government was actually asking in that case about explosives
19    that were in the defendant's room that they were worried the
20    defendant was going to detonate.  The officers here expressed
21    no such concern that Mr. Ciancia was going to detonate some
22    sort of explosive, even -- you know, they just -- nothing came
23    out about that at all.
24        To the extent they were concerned about an explosive and
25    they asked him that specific question, that might arguably be

1    justified.  But the questioning in this case went way beyond

2    that.

3         The other case cited by the government was a case where

4    the government agents were aware of a specific relationship

5    between that defendant and other plotters, and they had real

6    reason to suspect that they had communicated and coordinated

7    their attacks.  There's really nothing in this case based on

8    what those officers knew that would justify that.

9         And so the problem with applying the public safety

10   exception in a case like this one is that it would expand that

11   exception way beyond what it was even originally intended for.

12             THE COURT:  Are you saying that the public

13   perception is viewed narrowly, that you are only entitled to a

14   single topic area?  For example, are you the only shooter?  You

15   can't ask about are there bags elsewhere?  Are there other

16   things going on that might relate to this?  It's just one topic

17   area?

18             MR. LITTRELL:  This is a really important

19   distinction.  The line is drawn in *Quarles*.  The line is drawn

20   exactly at the point where you have a specific suspicion of a

21   particular threat.  It cannot be a general threat, and it can't

22   be a threat to another place or another set of people.

23        But the important part of the Court's question is this.

24   That does not mean that the government can't ask the question.

25   What that means is the responses aren't admissible under

1  Miranda.  And those are two different things.

2      Miranda is a prophylactic rule.  It's constitutionally

3  based.  But it's a prophylactic rule, and it's not -- it's

4  designed to protect defendants.  So to the extent that there's

5  tension between the government's need to investigate an ongoing

6  threat and a defendant's right not to be interrogated outside

7  of Miranda, both can have -- you know, the only consequence of

8  the government's asking the question when they were not

9  permitted to under Miranda in the public safety exception in

10 *Quarles* is that the answers aren't admissible.  And the only

11 answers that aren't admissible are the answers that aren't

12 covered by that exception.

13     So if you were to go -- if you go through Officer Yu's

14 declaration where he sort of sets forth the questions that he

15 asked, the question, "Are you the only shooter," that's

16 justifiable.  That's exactly the type of question that would be

17 justified by *Quarles*.

18     A closer call is questions about explosives when they had

19 no sort of indication that there was explosives in this case.

20 And also a closer call is whether there is other shooters, when

21 there's no indication that there are other shooters.

22     But there are other questions that he asked that are so

23 far afield and so clearly not related to the immediate threat

24 that they are investigating that they can't possibly fall

25 within that exception, questions about how he got to the

1    airport, whether his -- somebody drove him there, whether that

2    person who drove him there knew what he was about to do.  And

3    if he didn't know what he was about to do, how could that

4    person not know.  This is clearly investigation.

5         And the government doesn't really make a robust effort to

6    defend those questions in its briefing, and I'm not sure they

7    want to defend those questions now.  But at some point, if the

8    Court were to allow that level, that sort of breadth with the

9    questioning, the exception really does swallow the rule.

10   There's no reason that same rationale couldn't apply in a gang

11   case in some sort of dope deal.

12        You know, there's always a possibility and a threat of

13   larger criminal activity.  But without a specific articulable

14   threat, an immediate threat from something else that justifies,

15   you know, breaching the Miranda rule, I think that that

16   questioning has to cease.

17        And so this may be -- you know, there's no case directly

18   on point that's exactly this type of facts.  But I think that

19   the facts that we do have, the sort of level of police

20   presence, this complete lack of any immediate threat to the

21   questioning officer or the officers around him really is

22   getting down to does the public safety exception justify

23   questioning about plots that there's no objective indication

24   exist at all.

25        And I think that -- I think the -- at least one of the

1    officers sort of acknowledged that.  They are trained to think

2    about these plots, but that doesn't mean there's something

3    objective about this case that causes that to be a concern.

4        And so in the government's briefing, they do sort of

5    address -- they talk about threats from co-conspirators, larger

6    attack plans.  They talk about other gunmen fanning out into

7    the terminals.  I think what -- the way to interpret *Quarles* is

8    really that, if the arguments that the government is making are

9    arguments that were not articulated by the law enforcement

10   officers on scene, then they don't count.

11       And, like I said, that doesn't mean that the questioning

12   wasn't -- couldn't be done.  I think a lot of these officers

13   thought that Mr. Ciancia was going to die.  All that means is

14   that the questioning isn't admissible under Miranda.

15       So for that reason, I think all the answers should be

16   suppressed under Miranda.

17       I want to turn to voluntariness because I think it has --

18   it's potentially even more impactful.  This is another question

19   on which the government bears the burden of proof.  I think the

20   facts that came out at this hearing show that *Mincey* really is

21   right on point.  *Mincey* was a case like this one where the

22   defendant was in the hospital having just sustained very

23   serious injuries, and I don't think anybody questions the

24   severity of his injuries in this case.

25       Mincey couldn't speak, just like Mr. Ciancia couldn't

speak.  He was not in a position to resist questioning or to

decline to answer questions.  He was losing blood, I think.

You know, the pictures sort of tell the whole story about how

much blood he was losing.  Some witnesses testified he may have

been going into shock or he was experiencing some of the

symptoms of shock.

          THE COURT:  Is *Mincey* distinguishable?  Because in

*Mincey*, he actually lost consciousness, and he was apparently

confused by the officer's questioning.  Neither circumstance

exists in this questioning?

          MR. LITTRELL:  Well, we don't know.  You know,

there's an open question about whether Mr. Ciancia was confused

by the questions.  He didn't testify.

          THE COURT:  Is there any testimony that he was

confused by the questioning?

          MR. LITTRELL:  There's no testimony about his

thought process at all, Your Honor.  But I think that -- and I

think *Mincey* is distinguishable on both of those two points.

But I'm not sure those distinctions actually help the

government.

     The fact that he lost consciousness -- he wasn't

questioned when he lost consciousness.  He was questioned when

he returned to consciousness.  He was in pain just like Ciancia

was in pain.  But here are the key --

          THE COURT:  Someone who loses consciousness is in a

```
 1   different place than someone who has never lost consciousness.

 2             MR. LITTRELL:  I would -- I don't think that

 3   distinction actually helps the government in this case because

 4   the reason that -- Mr. Ciancia was shortly after this incident

 5   admitted to the hospital where he was sedated, and he too lost

 6   consciousness, and so had the -- in Mincey the reason he was --

 7             THE COURT:  Lost consciousness has nothing to do

 8   with the interrogation.

 9             MR. LITTRELL:  That's right.  But the important

10   point being that there are two sort of -- if -- the sort of

11   operative set of facts is that Mincey was taken to the

12   hospital, treated, sedated.  So his pain was at least treated,

13   and one of the side effects of that is that he lost

14   consciousness, came into consciousness and left consciousness.

15   There's no indication that he was questioned when he was on the

16   border of consciousness.  That was an indication of the kind of

17   critical situation he was in.

18             THE COURT:  Didn't he lose consciousness during the

19   interrogation?  Is my memory incorrect?

20             MR. LITTRELL:  I'm not sure exactly, but I don't

21   think there's -- I think that -- I read the case this morning,

22   and I recall the police officer stopped questioning, and then

23   when he came to consciousness, they resumed questioning again.

24   Obviously you can't question somebody who's not conscious.

25         But I think the way to think about Mincey in this case is
```

1    that Mincey was treated for his injuries.  He was on

2    medication.  That's what caused those effects.  Ciancia had not

3    been treated.  So Mincey had had sort of immediate first

4    responder care.  He was in stable condition in the hospital.

5    Ciancia was -- had no treatment, no pain relief.  It's much

6    more likely that Ciancia was in shock or experiencing the sort

7    of immediate consequences of his injuries than Mincey was.

8         And so the real question is -- you can't really parse the

9    cases out on the facts, but --

10             THE COURT:  Mincey also indicated he didn't want to

11   be interrogated as well.

12             MR. LITTRELL:  That's true.  And so -- and I think

13   that that's -- so the question is what is a -- what is a

14   more -- what goes to voluntariness more, somebody who indicates

15   they don't want to be interrogated and is interrogated anyway

16   or someone who is never even informed that they have a right

17   not to be interrogated?  Because Mincey was read his Miranda

18   rights, and Mincey had an opportunity to reflect on what those

19   rights were, whereas Ciancia never got those rights, never got

20   to reflect.  He was literally questioned, I think Officer Yu

21   said, within two minutes, I think, or three minutes of --

22             THE COURT:  I can go back over my notes.

23             MR. LITTRELL:  He was questioned immediately after

24   he'd been shot.  And in a situation where there's no indication

25   that his condition was stable or is going to stabilize, I think

 1    the witnesses did testify they were worried that he would die.

 2         And so that doesn't -- so where the facts are different

 3    from *Mincey*, I don't think that they are less compelling than

 4    *Mincey*.  And there's no case that I found where someone is

 5    questioned so immediately following such an extreme trauma.

 6         Now, which gets to the question about police coercion.

 7    The government has taken the position well, there's no police

 8    coercion in this case.  So it can't possibly be involuntary.

 9    But what we know from *Preston* is that the way that the Ninth

10    Circuit has --

11              THE COURT:  I don't agree with that position.

12              MR. LITTRELL:  I'm not surprised to hear that.  But

13    the Ninth Circuit's published case law interprets *Connelly* to

14    say that the type of coercion in a given case does not need to

15    be in police misconduct.  It doesn't need to be misconduct at

16    all.  It can be the exact same type of conduct that you

17    would -- that for one person wouldn't be coercion at all.  It's

18    the binding case law in this Court.  And I can see why it might

19    be an aggravating case to interpret for the Court, but that

20    doesn't change that that's the case that applies.

21         One of the facts I learned just this morning, what we

22    heard from Sergeant Zouzounis, is that one of the things that

23    the government claimed in its brief in support of its position

24    isn't true.  And I believe that they claim something along the

25    lines of no one confronted him or implied that his answers were

```
 1    false.  And I don't have it right in front of me.
 2         It turns out that Zouzounis did exactly that.  When he
 3    asked Mr. Ciancia whether he was alone after Ciancia told the
 4    truth multiple times, he confronted him and he called him a
 5    fucking liar.  And the person he's saying that to is a person
 6    who is bleeding out, handcuffed behind the back, in critical
 7    condition.  And so in terms of the voluntariness inquiry, this
 8    is a little bit more like Preston than it once would be, and
 9    it's partly because of the conduct of Sergeant Zouzounis.
10         So, ultimately, every case -- and I think, you know,
11    Mincey says this -- it has to turn on its facts.  It's not a
12    paint-by-numbers approach.  But this is -- but the undisputed
13    facts here are that this is a person with critical wounds,
14    bleeding out, losing tremendous amounts of blood, three gunshot
15    wounds to the head with no treatment.
16         And so I think the words that the Court said in Mincey is
17    it's hard to imagine, you know, a situation more coercive than
18    that.  I think that applies with equal force in this case.  And
19    so for the same reasons set forth in Mincey, I think all of his
20    answers, including the ones about whether he's a solo shooter,
21    should be suppressed, Your Honor.
22              THE COURT:  Thank you.
23         Government?
24              MS. CURTIS:  Does the Court wish to hear any
25    argument on whether or not the public safety exception actually
```

**UNITED STATES DISTRICT COURT**

1    exists?  I know that was brought up in the defendant's reply

2    brief, and he didn't discuss it.  I'm prepared to discuss that.

3              THE COURT:  No.

4              MS. CURTIS:  Okay.  *Quarles* also told us that the

5    availability of the exception does not depend on the officer's

6    individualized motivation.  And here -- in *Quarles* they had a

7    store.  And in this case we had the Los Angeles International

8    Airport on a busy weekday at 9:00 in the morning, and the gate

9    area was filled with passengers.  That's what we had.  This

10   happened and unfolded within minutes.

11        Officer Yu asked the question --

12             THE COURT:  What's the testimony I can rely on?

13   Because I understand it was 9:00 in the morning on a business

14   day, but -- and I can assume and presume that the gate area was

15   filled.  But I haven't heard any testimony that the gate area

16   was filled.  I know it was evacuated, clearly.  But I don't

17   have any sense as to 10 people, 10,000 people.  What can you

18   point to that I would be able to say that it's the area filled

19   with people?

20             MS. CURTIS:  Perhaps the word "filled" is incorrect,

21   Your Honor.  I don't think we put any evidence -- we certainly

22   have evidence, but we didn't put any evidence here in this case

23   that it was filled with people.  I think Officer Yu --

24             THE COURT:  He said several passengers.

25             MS. CURTIS:  Yes.

1          THE COURT:  All right.

2          MS. CURTIS:  Officer Yu and Sergeant Zouzounis both

3     testified that, after the fact, there were still passengers in

4     the terminal.  And I think Sergeant Zouzounis said within at

5     least 50 feet of the defendant, and 50 feet would have been the

6     furthest away that they were, the closest people.

7          But these questions that Officer Yu is asking, all of the

8     questions, "Are you the only shooter?  Do you have other

9     weapons," they don't know.  They don't know the defendant.

10    They don't know what happened.  They don't know how he got to

11    the airport.  They don't know if he was conspiring in advance

12    with anyone else.

13         And sure, we'll agree that at the moment after he was

14    shot, perhaps there wasn't a threat that the defendant was

15    specifically going to do anything, but we didn't know if he was

16    an employee.  We didn't know if he had access to secure areas.

17    We didn't know if he had a bomb.  We didn't know who brought

18    him.

19         And, of course, while this is all going on, the officers

20    are receiving reports over their radios that there is another

21    shooter.  And they are in the gate area.  And yes, the direct

22    area around the defendant is clear.  But there were people

23    still in that terminal.  And so somebody -- if there was

24    another shooter, somebody hiding out, they would have been

25    sitting ducks.  The public could have been sitting ducks.

1     And so all of these questions abut, "Do you have a car?

2   How did you get here?  How long has it been," they are hearing

3   that there's another shooter.  Simultaneously, they are trying

4   to ascertain from the defendant, "Were you alone?  Was there

5   another shooter?  Well, then how did you even get here?  Is

6   that person an accomplice?  Is that the person, you know, who

7   might shoot us?"

8     And so I think all of these questions, including the

9   questions about the defendant's identity, all go and are all

10  well within the public safety exception in this case when we

11  are talking about Los Angeles International Airport on a busy

12  weekday.

13    With respect to the voluntariness, one thing we haven't

14  talked about yet is Government's Exhibit 3.  Those are the

15  medical records.  These are the medical records -- some of the

16  medical records of when the defendant was initially admitted

17  into the hospital.  And if we look at page 40, and that's

18  Bates No. 2788.

19            THE COURT:  Hang on.

20            MS. CURTIS:  Down at the bottom --

21            THE COURT:  Hang on.

22            MS. CURTIS:  It indicates that --

23            THE COURT:  Hold on.

24            MS. CURTIS:  Okay.

25            THE COURT:  Okay.

1           MS. CURTIS:  Down at the bottom, the paragraph

2    beginning with "Sanders," it indicates that "The patient was

3    reportedly attempting to speak to the paramedic but unable to

4    do so.  Patient alert upon EMS arrival with stable vitals

5    en route.  Denies any lack of consciousness."  And on the next

6    page, under "Physical Exam," he was oriented to person, place,

7    and time.

8        So in addition to the testimony from Officer Yu and

9    Officer Swegles, we also have the medical records that even

10   after some time has passed when the defendant is arriving at

11   the hospital, he's oriented times three, he's alert, denies any

12   loss of consciousness.

13       As I was reading these cases, it definitely seems like a

14   lot of defendants who are injured want to say that they are

15   exactly like *Mincey*.  And in *Mincey*, the defendant was

16   questioned for four hours.  Here the defendant was questioned

17   for, I believe the testimony was, two to three minutes or

18   something like that.

19           THE COURT:  Three or four.

20           MS. CURTIS:  And the defendant complained of

21   unbearable pain in his leg.  He was going in and out of

22   consciousness.  He repeatedly told the detective that he didn't

23   want to talk anymore.  He said the word lawyer.  He asked for a

24   lawyer.  He begged them to stop.  And the detective didn't

25   stop.

1     And as the defendant would lose consciousness, the

2 detective was right there when he woke up, he continued the

3 questioning.  And I think that's the kind of coercion that

4 *Connelly* is concerned about.

5     And I think also in the *Preston* case, there was also --

6 that was the defendant who was accused by his eight-year-old

7 neighbor of sodomizing him.  And there I think that defendant

8 is also -- you can distinguish that defendant from this

9 defendant.  That was the intellectually disabled defendant who

10 was in special ed his whole life until he dropped out of high

11 school.  He was 18 years old.  He told the officers, "I'm not

12 all there.  I have problems with my head."  And he didn't even

13 understand what the word "disabled" meant.

14     As far as coercion goes in that case, the police told the

15 defendant that a written confession was really just an apology

16 note to the child, that he would not be punished if he admitted

17 to just being a one-time child rapist.

18     They tried to get the defendant to confess to a lesser

19 heinous crime instead of the more heinous crime.  They repeated

20 pressure for the defendant to change his answers every time the

21 defendant provided answers.  They rejected the defendant's

22 denial of guilt, instructed him on the responses they would

23 accept, and fed the defendants details of the crime they would

24 accept.  That is the coercion that was present in *Preston*, and

25 that is what we don't have here.

1        Officer Yu was calm, conversational.  He was gentle.  He

2   wasn't yelling at the defendant.  He didn't have his gun

3   pointed at the defendant.  These were specific targeted

4   questions to ascertain and neutralize any threat that the

5   defendant posed and that the defendant organized or

6   orchestrated prior to being in the position he was when

7   Officer Yu was speaking to him.

8        In the Second Circuit case -- I'm looking for -- that was

9   the *Khalil* case.  That was a Second Circuit case in 2000 when a

10  roommate of two suspects told the NYPD that his roommates were

11  going to make bombs and bring them to a crowded subway or bus

12  terminal and detonate them.  The roommates led the officers in

13  a raid on the apartment.  And when the officers got inside --

14           THE COURT:  Slow down, please.

15           MS. CURTIS:  Okay.  Sorry, Your Honor.  The officers

16  got inside.  One of the suspects grabbed the gun of one of the

17  officers.  Another man was crawling toward a black bag that the

18  officers believed contained a bomb.  The officers shot and

19  wounded both men who were handcuffed and taken to the hospital.

20       The officers went to the hospital to question one of the

21  suspects who was not Mirandized about the bombs.  And, again,

22  that wasn't a single question.  That was multiple questions,

23  how many bombs, how many switches, which wire should be cut,

24  these kinds of questions.  And although the suspect complained

25  of pain during the questioning, he was alert, understood the

1    questions, and gave responsive answers.

2         And I think in these cases that are in both parties'

3    briefs, many of these defendants indicated that they

4    experienced pain, and the Courts are still finding that the

5    statement doesn't necessarily render their statements

6    involuntary.

7         And in *Preston*, the Ninth Circuit specifically said that a

8    finding of involuntariness cannot be predicated solely upon the

9    defendant's mental state, that his mental state is relevant to

10   the extent it made him more susceptible to mentally coercive

11   police tactics.

12        Again, it sounds like the defense's entire argument is

13   that the defendant was injured.  We are acknowledging that.

14   The defendant's injury is not enough to render these statements

15   involuntary.

16        The defendant was responsive, and he was actually

17   accurate.  I mean, it's incredible, just as Officer Swegles

18   said.  It's incredible that given this injury, he was this

19   alert, this responsive, this lucid, and this accurate.  He was

20   able to describe how he got to the airport, the kind of car

21   that took him to the airport.  This is not someone whose will

22   was overborne.

23        I think, when you look at the totality of the

24   circumstances, when you look at the declarations, that the

25   defendant was alert, answering the questions, responsive -- and

1    even when he arrived at the hospital, once again, he's still

2    alert.  He never lost consciousness.  He's oriented times

3    three.

4        The questions were very limited, a couple of minutes, and

5    they were specifically targeted to ascertain the threat that

6    the officers were concerned about at that time.  And I'll

7    submit.

8              THE COURT:  The last word, Mr. Littrell, briefly.

9              MR. LITTRELL:  All right.  Just a couple of things.

10       I just noticed when the government was characterizing the

11   types of threats that the Court -- that it wants the Court to

12   consider for the purpose of the *Quarles* exception, the public

13   safety exception, they prefaced the scenarios with, you know,

14   they didn't know.  We didn't know what was going on in the

15   airport.  We didn't know what other threats might exist.  And I

16   think that defeats the argument right there.  I think one thing

17   that *Quarles* requires is that it be a specific suspicion of a

18   threat that's imminent.

19       And beyond that, I think it would just expand the

20   exception far more broader than I've seen it applied in any

21   other case.  In no case the government has cited was the

22   government allowed to ask questions about threats that were

23   completely -- that were not based on something articulable that

24   the defendant said or did.

25       On the voluntariness question, I just want to address

1    Exhibit No. 3.  I'm looking at this right now.  It looks like

2    the first time he was seen by the emergency department

3    physician was 1100 hours on 11/1/2013.  So that's approximately

4    an hour and a half after he had been shot.

5        In the interim, he had been treated by first responders.

6    He had been given an IV in the ambulance.  I believe we had

7    testimony on that.  He had been laying prone.  And I believe we

8    also had testimony from Officer Yu that the bleeding had slowed

9    by that point.  So it makes a lot of sense that he might show

10   more stable vital signs, be more oriented as to person, place,

11   or time than he was when he was initially shot.

12       But that's what gets to this whole question in this case.

13   Both parties have cited cases involving other types of

14   scenarios, but the Court doesn't really have a specific

15   precedent it can hang on to as someone who's questioned within

16   minutes after having been shot and in none of the cases that

17   either party cited.

18       So the Court is just going to have to decide based on all

19   the precedent we cited whether under these specific facts these

20   were voluntary statements.  And the Court has to deal with the

21   *Preston* case, even if it doesn't like the reasoning in that

22   case.

23       The government sort of suggests that Mr. Ciancia's injury

24   in and of itself is not enough to constitute government

25   coercion, but that's not the only fact here.  While he was

1   injured, he was also cuffed behind his back, he was also

2   aspirating blood, and he was also being questioned immediately

3   by officers who did not Mirandize him as the officers in *Mincey*

4   did.

5       And so there is police coercion.  And just like the

6   *Preston* case says, that might not have been coercive under

7   different circumstances with a defendant who is not mortally

8   injured, but under these circumstances, it certainly was.  So

9   I'd ask the Court to just take that into account when ruling on

10  the voluntariness question.

11          THE COURT:  All right.  Thank you.  The matter will

12  stand submitted.

13      Let me just take a five-minute break.  And then what I'd

14  like to discuss next is the state of the motion re discovery of

15  information concerning the confession of the grand and petit

16  jury venire, specifically how best to proceed given the

17  information that you have about how the Court accumulates

18  information and the way it accumulates information.

19      And I'm not sure if the parties are prepared to talk about

20  it, but -- we could put it for another day, but I wanted to

21  spend some time discussing what was filed, docket No. 168, on

22  July 13, 2015, And that's the joint proposed jury selection

23  procedures, because I'm not on board with the procedures.  So

24  if we are not prepared to talk about it today, that's fine.  We

25  can put it for another day.  Then I can discuss that.

1          Those are the two other things.  I don't know if the

2     parties have other things on their mind.  Five minutes.

3               (A brief recess was taken.)

4               THE COURT:  On Friday I asked the CRD to communicate

5     and pass along certain materials.  I want to identify them and

6     have them placed on the docket so that everyone knows what we

7     did.

8          So on Friday I basically had the post tentative ruling on

9     the defense's motion regarding the information concerning the

10    confession of the grand and petit jury venire as a tentative

11    ruling.  I also passed along a memo that I received from the

12    Court, because once I read it, you needed to see it.  And so

13    I'd like to have those filed on the docket.  The memorandum I

14    would like to file under seal available to the parties.  And

15    then the tentative ruling.

16         What are your thoughts with regard to how we should

17    proceed from the tentative ruling?  Do you want to submit

18    something in a couple of weeks that -- it seems some data is

19    stored in ways that you didn't ask for.  So I want to give you

20    an opportunity to talk about it.

21              MR. ROWE:  And we appreciate that, Your Honor.  If I

22    may, what I'd like to do is talk first about the years, the

23    2011, 2012, 2014, 2015 data, and address the tentative on that,

24    and then I'd like to address what I'll call housekeeping

25    matters.

1            THE COURT:  Okay.

2            MR. ROWE:  So I believe the housekeeping matters are

3    less daunting than it seems.  We are not interested in

4    personally identifiable information, and I think we have ways

5    to address it that we will probably spell out in the memo.

6            THE COURT:  Okay.

7            MR. ROWE:  Okay.  So the premise of sections 1861 to

8    68 of Title 28 are to provide for and promote the discovery

9    needed for a defendant to present a fair cross-section claim

10   and to identify problems with the cross-section.  The critical

11   case, of course, is *Test v. United States*, which says that

12   there's first an unqualified right to inspect and, second, that

13   this right is required, quote, "not only by the plain text of

14   the statute but also by the statute's overall purpose of

15   ensuring a fair cross-section."  So what I want to do now is

16   focus first on the purpose and second on the text.

17       The tentative, in particular, quotes from the *Diaz* case on

18   page 6.  One, two, three, four lines down in the quoted

19   paragraph, *Diaz* says, "Defendants confused the requirements for

20   disclosure under the act and disclosure for a constitutional

21   claim.  The decisions cited involved constitutional fair

22   cross-section challenges.  Defendants may be permitted to

23   inspect the records of past and petit juries in preparation for

24   a constitutional claim, but defendants must first present some

25   evidence tending to show the existence of the essential

1    elements of their challenge."

2         So what that says is we can show something first.  If

3    there's a problem, we can come back later, an iterative

4    process, and that's okay.  But I want to suggest that that's no

5    longer good law.  The en banc decision of the Ninth Circuit in

6    *United States v. Hernandez-Estrada* at 749 F.3d 1154 at 1158

7    disagrees with that quotation.

8         It says, and I'm quoting, "The same analysis determines

9    whether the jury selection procedures meet the fair

10   cross-section requirement, both under the Jury Selection and

11   Service Act and the Sixth Amendment."  So it's a single test,

12   not two different tests as *Diaz* sets out.

13        Moreover, just showing statistical disparities isn't

14   enough for a defendant to prevail under the act.  *Duren v.*

15   *Missouri* says that a defendant has to show disparities,

16   statistical disparities, that there's a distinctive group in

17   the community that's the subject of these disparities, and

18   underrepresentation caused by systematic exclusion of that

19   group.

20        So the argument is that systematic exclusion requires the

21   demonstration of historical patterns.  It's not enough just to

22   show, in other words, statistical diversions, and we need the

23   other years in order to demonstrate the pattern that we need to

24   prevail.

25        I'll give you an example, Your Honor.  Let's call this the

1   voter registration hypothesis.  In 2013, the district changed

2   jury plans.  And it moved from relying solely on voter

3   registration rolls for source data to relying on merged voter

4   registration data and Department of Motor Vehicles data.

5          Now, in *Hernandez-Estrada*, the en banc case from the

6   Ninth Circuit last year, the Ninth Circuit held that showing

7   statistical disparities and the sole use of voter registration

8   is not enough.  You need to link the two.

9          So to show that link, one way to do that would be to show

10  the statistics changing as the district moves from one system,

11  voter registration, to another, Department of Motor Vehicle

12  data.  So we would need those historical years in order to show

13  that the statistical disparity in 2013, the year of the grand

14  jury indictment, was caused by using voter rolls and not

15  Department of Motor Vehicle records.

16         Second, the text of 1867 and section 1868.  Section 1867

17  first protects only the current jury wheel.  It holds that

18  first there is to be no disclosure except --- under the plan

19  except pursuant to the district court plan or as may be

20  necessary in preparation or presentation of a motion until

21  after the master jury wheel has been emptied and refilled

22  pursuant to the statute.  So it contemplates -- the statute

23  contemplates the disclosure of older records.

24         And section 1868, the next section, confirms this.  It

25  says, "After the master jury wheel is emptied and refilled, all

records and papers shall be saved for four years," and I'm
quoting now, "and shall be available for public inspection for
the purposes of determining the validity of the selection of
any jury."  So we are entitled to this information from 2011,
2012, 2014 and 15 under section 1868.

The Ninth Circuit case of the *United States v. Beaty*,
which is an old one from 1972, that's 465 F.2d 1376 at 1381.
*Beaty* says first it's an error to deny a motion for old
records.  And, second, it says that the statutes clearly mean
what they state.  Appellant, quote, "was entitled to inspect
the old records from the master jury wheel and the contents of
the records or papers used by the jury commission" in addition
to the stuff available under 1867(F).

So we have section 1868.  We have the *Beaty* case.  And
then we have the plan itself.  The current jury selection plan,
section 12, at page 15 lines 9 to 12 says, "During the four
years after the release of the master wheel and the
substitution of a new one, all jury selection records shall be
available for public inspection for the purpose of determining
the validity of the selection of any jury.  These records will
be available" -- "will not be available for reproduction or
copying without an order of the Court."

So the plan contemplates public availability of these
older records, and it simply requires a court order in order to
protect things like privacy, redaction, the prevention of

1    dissemination of personally identifiable information.

2        It requires a court order to protect privacy.  But also a

3    court order is helpful to avoid the awkwardness of having to

4    camp out in the clerk's office and copy this yourself, the

5    awkwardness and the inefficiency.

6        So for that reason, Your Honor, we ask that you reconsider

7    the limitation proposed in the tentative on the years and

8    expand it to the years we ask for, 2011 or so to 2016 rather

9    than just 2013 and '16.

10               THE COURT:  I'll take a look.

11               MR. ROWE:  Okay.  We appreciate that.

12       And now to the housekeeping matters.  One really minor

13   thing I'd like to point out is item H, any AO-12 or JS-12

14   forms.

15               THE COURT:  Yes.

16               MR. ROWE:  AO-12s are clearly jury selection

17   records.  JS-12 forms are not defined in the plan as jury

18   selection records, but they are the same thing as AO-12s.  They

19   are the predecessor form.  So when the plan came into

20   existence, it speaks of A-12s, but we are interested in the

21   possibility there might have been some of these forms printed

22   at JS-12s.

23       And I don't think there's a material difference such that

24   it's necessary to send that over to Chief Judge King.  We have

25   no objection to sending the nonjury selection documents over to

```
 1    the chief judge.

 2              THE COURT:  J?

 3              MR. ROWE:  I'm sorry?

 4              THE COURT:  J?

 5              MR. ROWE:  J?  Oh, what in particular about J?

 6              THE COURT:  I'm sorry.  It's going to be C, E, G, I,

 7    and J --

 8              MR. ROWE:  C, E, G, I --

 9              THE COURT:  J.

10              MR. ROWE:  Part of J.  J, the memo that you'll

11    attach to your order says that the actual completed summonses

12    are jury selection records.  And your tentative accepts that --

13              THE COURT:  Okay.  Right.

14              MR. ROWE:  -- in the footnote -- the footnote on the

15    bottom of page 5.  And we agree with that.

16              THE COURT:  All right.

17              MR. ROWE:  Basically, just to make this a little

18    less complicated and confusing, the method here is we are

19    trying to go from source data, the raw data, to the actual jury

20    pool and show the steps and processes where you get from A to B

21    and to see if there is anything systematic in those decisions

22    getting you from the front end to the back end that would

23    satisfy the systematic requirement of the Duren case in showing

24    any statistical disparities that show up pursuant to this

25    discovery.  So that explains the kinds of thing that are in the
```

**UNITED STATES DISTRICT COURT**

1   list.

2       You are correct that the jury plan doesn't define things

3   like C, E, G, and I as jury selection records.  So if you --

4   Judge King is welcome to rule on those.

5           THE COURT:  Do you want the matter referred to

6   Judge King as to those matters?

7           MR. ROWE:  Yes, we do.  We do.

8       And, finally, as to all of the concerns raised in the

9   memorandum regarding personally identifiable information, we

10  want to be clear.  We do not want personally identifiable

11  information.  We do not want names.

12      We believe that it is possible to do this relatively

13  inexpensively by putting the clerk's office in touch with

14  clerk's offices from other districts that have successfully

15  done this and putting them in touch with people from the

16  administrative office who have overseen this office.

17      In other words, it's been done before, and there's no

18  reason it can't be done now.  We would be happy to provide

19  additional explanation if that would be helpful to the Court.

20  We don't want names, for example.  We don't need any --

21          THE COURT:  The redacted stuff -- but how about the

22  way data was requested and how it's actually -- the form is how

23  it's actually collected in the clerk's office?

24          MR. ROWE:  Which section are you referring to?

25          THE COURT:  Just the last --

1          MR. ROWE:  Are you talking about J, the

2     questionnaires?

3          THE COURT:  Well, that's easy.  You referred to them

4     as summons.  These responsive questionnaires which you can

5     have --

6          MR. ROWE:  Right.

7          THE COURT:  -- with the redacted information.

8          MR. ROWE:  Right, we'll just have that redacted.

9          THE COURT:  Right.  But does the memo that was

10    attached, does it -- how does -- in your view, does it offer --

11    alter any of the information or the production requests?  At

12    some point in time you were calling it different things.

13    That's what I'm talking about.

14         MR. ROWE:  Oh, we meant the same thing by

15    questionnaire, summons.  The two are one after another.

16         THE COURT:  The way that you -- the format of the

17    data doesn't have to be changed by the clerk's office?  It

18    would just be presented as it's maintained by the clerk's

19    office?

20         MR. ROWE:  That's correct.  We are willing to

21    accept --

22         THE COURT:  Whatever they have.

23         MR. ROWE:  -- spreadsheet comma separated value --

24    variable or value data.  The only thing we can't readily deal

25    with is propriety databases, and there's no indication in the

1  memo that they used one.

2          THE COURT:  So you are satisfied accepting the

3  records as they are -- in the form that they are kept in the

4  clerk's office without changing the form of the record?

5          MR. ROWE:  That's correct.  We don't have any need

6  to change the format, and we are able and willing to work with

7  the clerk's office in order to procure that information in the

8  easiest way possible, by consulting other clerks, by having

9  someone with computer training contact their individuals with

10  computer training.  Sometimes it's easier to have a computer

11  person talk to a computer person than to go through lawyers.

12          THE COURT:  All right.  So I'll take a look at the

13  years that were denied.

14          MR. ROWE:  Okay.

15          THE COURT:  All right.

16          MR. ROWE:  Thank you.

17          THE COURT:  Thank you.  Counsel, do you want to

18  leave it for another day, or are you prepared to discuss the

19  jury selection procedures today?

20          MS. CURTIS:  I think we would all love to discuss

21  those on another day if that's okay with the Court.

22          THE COURT:  That's fine.

23          MS. CURTIS:  You did indicate that you --

24          THE COURT:  You have to come back and tell me this,

25  a couple of things, why it is that I have to involve counsel in

1    time qualifying the jurors, why I would let counsel involved in

2    the practice of time qualifying jurors in light of the fact

3    that they are not going to know -- they are not going to know

4    any facts of the case.  All they are going to know is this case

5    is scheduled to take X amount of time.  Can you do it?

6         And that's the kind of time qualifying that goes on, and

7    the case law is pretty well settled, it goes on without

8    stipulation -- it can go on without the stipulation of counsel.

9    It's rare because typically criminal cases are so short.

10        But why it is that I would involve counsel in time

11   qualifying, why -- I'm not going to -- or at this point my

12   tentative would be that -- so essentially the clerk's office

13   would time qualify and get to us the first set of jurors that

14   we need.  Then they would fill out some kind of questionnaire

15   on a given date with some kind of statement to the Court with

16   instructions how to fill it out.  I don't care who is present

17   and who is not.  We can work out the details in terms of how --

18   the questionnaires are handed out.

19        Explain to me -- I understand that some courts death

20   qualify jurors one at a time.  As it stands today, I'm not

21   prepared to do that.  I intend to do it in small groups,

22   meaning 40 or less, 20 people, 30 people, maybe 20 in the

23   morning and 20 in the afternoon.  But I'm not inclined to

24   individually, you know, question the jurors one at a time, you

25   know, 14 or whatever was proposed per day.  I'm not going to

1   spend a couple weeks on that.  I suspect that I will death

2   qualify in four days.

3       I don't intend to allow at any stage attorneys to ask the

4   jurors questions at any point during the proceeding.  And I'm

5   not convinced that somehow at the end of the day I've got to do

6   this reconfiguration again that's proposed later on in the

7   voir dire procedures.

8       But essentially what I wanted to communicate, I wasn't on

9   board with virtually 90 percent of the proposed plan.  So come

10  back and discuss it with me why this plan is a great plan and

11  why I should use certain aspects of it.  So you have my

12  thinking, and I'll give you a chance to tell me why.

13          MS. CURTIS:  Do you think you can be persuaded?

14          THE COURT:  I doubt it.  But, you know, my mind

15  is -- I think I've changed my mind every once in a while.  But

16  I'm not -- I can't see myself doing this.  I'm not going to --

17  I can't see myself doing this.  I've never told you my -- you

18  obviously agreed on a plan.  I don't agree with the plan.  You

19  never heard that I didn't agree with the plan.  So now you've

20  heard I don't agree with the plan.  So we need to have a better

21  discussion as to why these are good ideas.

22          MS. CURTIS:  And I think the big one, as we're all

23  sitting here, I could hear the gasp as no attorneys conduct

24  voir dire.

25          THE COURT:  Absolutely none.  That is not going to

1    change.  None.  Zero.  That's not going to change.

2                  MS. CURTIS:  Okay.

3                  THE COURT:  That will not change.

4                  MS. CURTIS:  Well, it sounds like we all need to

5    discuss amongst ourselves.  Would the Court like to schedule a

6    hearing now that we can come back --

7                  THE COURT:  Whenever you want to do.  I'll work with

8    you.

9                  MR. NOVAK:  Your Honor, Richard Novak for

10   Mr. Ciancia.  If it would be okay with the Court, I think the

11   best thing would be if we -- if the two parties could consult

12   about these issues and maybe -- I mean, I can't speak for the

13   government -- consult with some of our own resource people and

14   then propose --

15                  THE COURT:  Tell me why these are good ideas.

16                  MR. NOVAK:  -- some dates to the Court is what I'm

17   suggesting, that we not setting a hearing right now.

18        And counsel is right.  I think -- I personally think that

19   the ability of defense counsel to conduct an appropriate and

20   limited attorney voir dire in a death penalty case of this

21   nature is critical.  I hear what the Court is saying, but I --

22                  THE COURT:  You heard what I said.  So I'm going to

23   give you a chance to tell me why --

24                  MR. NOVAK:  Right.  So maybe what we need to do is

25   either file a supplemental statement, either separate or joint,

1    depending upon how the parties view these different issues that

2    the Court mentioned, and then we can talk to the clerks -- the

3    clerk about a date.

4           THE COURT:  The other thing I want to talk about too

5    is -- I do want to be conservative in giving the time estimate

6    to the jurors, because I don't want to lose jurors because I

7    didn't give them a long enough estimate.  Nobody wants that.

8    But I do want some explanation as to the ten weeks, as to how

9    that's in your mind -- I understand it's early.  It's still

10   rough.  And it's a long time, relatively speaking, several

11   months before everybody pins down their case, how their case is

12   going to be presented.  But I want some preliminary discussion

13   why it's ten weeks.

14      So I see in my mind the vast amount -- assuming there's

15   for the defense an adverse guilty verdict, the bulk of the time

16   is going to be spent on penalty.  I want to have that

17   discussion on time estimates, a better idea than just throwing

18   ten weeks at me.  That may be fine, but I want a better

19   discussion on that.

20          MR. NOVAK:  I think the more specificity the Court

21   asks for, the more it requires the defendant to show his cards,

22   if I may.

23          THE COURT:  No.  Just talk about other cases maybe.

24   Well, this case, you know --

25          MR. NOVAK:  Okay.  Understood.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Just ballpark.  I'm not saying, like,

2   oh, we only think it's going to take one day.  That reveals a

3   lot of information.  We think it's going to take six weeks.

4   That reveals a lot of information.  I just want some idea as to

5   why -- how do we get to the ten weeks?  I don't want the

6   defense to reveal any strategies, but I just want to find --

7   have some understanding as to how this number was arrived at

8   and what --

9          MS. CURTIS:  I can tell you from the government's

10  perspective -- and I hate to say this now, especially with your

11  comment that there will be no attorney-conducted voir dire --

12  but it was essentially three weeks for voir dire, three weeks

13  for the guilt phase, and if we were going to have a penalty

14  phase, three weeks for the penalty phase, plus an extra week

15  just in case.  That's how we came up with that.

16         THE COURT:  Okay.  That -- all right.  That's the --

17  okay.  If you eliminate the voir dire aspect of the case,

18  that's sort of the ballpark where I thought this case would end

19  up, six or seven weeks.

20         MS. CURTIS:  But we might be able to persuade you.

21         THE COURT:  Go ahead.  I mean, I'm going to -- I

22  mean --

23         MS. CURTIS:  For the same reason Mr. Novak said that

24  he would like voir dire, the government feels the same way.

25         THE COURT:  Okay.

1      MR. NOVAK:  Can I just try to summarize, because we

2  all were -- it's fine, but we didn't know we were going to

3  discuss this.

4      THE COURT:  Right.

5      MR. NOVAK:  The Court wants to hear more about why

6  we think individualized death qualification is necessary.

7      THE COURT:  I'm sorry to interrupt.  I would just go

8  through your list and tell me you think -- whatever you -- you

9  obviously put this in black and white.  You want it.  So tell

10  me why it's a good idea.

11      So take everything that you want -- don't just limit it to

12  my comments, because basically I've almost rejected 90 percent

13  of it.  So go back and tell me why, you know, time qualifying

14  should be done this way, why it's a great idea, why it's a

15  great idea to -- I know you are going to point to some

16  literature, I get it, on how some judges have done it and

17  others haven't done it.

18      But -- so tell -- just go through and tell me -- don't

19  limit it to what I've talked about today because I may have

20  forgotten to say something.  So go through it.  You were pretty

21  detailed about what you wanted.  I just want to -- I want to

22  talk to you about why it's a good idea.  I wouldn't just limit

23  it to my comments today.  I would go through it.

24      MR. NOVAK:  Understood.  It's one of those

25  situations because it is an important part of the case where,

```
1   even though the parties are in agreement on the way it should
2   proceed, the Court needs some persuasion.
3               THE COURT:  That's right.  So work out a time frame.
4   We've got plenty of time --
5               MR. NOVAK:  Yes.
6               THE COURT:  -- that we can do it, and so talk to me
7   about why this is the procedure to be used.
8               MR. NOVAK:  Very well.
9               THE COURT:  All right.  Thank you.
10              MR. LITTRELL:  Your Honor, just one little brief
11  thing.  I know we've probably forgotten about the suppression
12  hearing by now.  But one issue came up in the testimony of
13  Sergeant Zouzounis.  He described in fantastic detail a
14  military-style tactical vest.
15              THE COURT:  Right.  And 101 and 102 don't reveal the
16  vest.
17              MR. LITTRELL:  Right.  So I just want to make an
18  offer of proof that there was no military-style tactical vest.
19              THE COURT:  Well, the only evidence I have is 101
20  and 102, and there's no vest.
21              MR. LITTRELL:  True, but potentially the vest could
22  have, you know, been taken off.
23              THE COURT:  The only testimony -- the only testimony
24  I have is that it wasn't taken off.  And then the
25  other testimony I have is what 101 and 102 depict.
```

**UNITED STATES DISTRICT COURT**

1          MR. LITTRELL:  So, as a matter of fact, the Court

2    would be inclined to find that there was no tactical vest?

3          THE COURT:  I don't see one.

4          MR. LITTRELL:  That's enough for me.

5          THE COURT:  And it wasn't taken off.  So --

6          MR. LITTRELL:  Okay.  Thank you.

7          (At 4:08 P.M. the proceedings adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15          DATED THIS  22ND  DAY OF OCTOBER, 2015.

16

17

18          /S/ MAREA WOOLRICH

19          _____
            MAREA WOOLRICH, CSR NO. 12698, CRR
20          FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25

**UNITED STATES DISTRICT COURT**